# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
HENRY G. HEFFERNAN,                       )
                                          )
            Plaintiff,                     )
                                          )
    v.                                     )
                                          )        Civil Action No. 15-2194 (RBW)
ALEX AZAR,[1] in his official capacity as  )
Secretary of the United States Department  )
of Health and Human Services,              )
                                          )
            Defendant.                      )
_____)

## MEMORANDUM OPINION

The plaintiff, Henry G. Heffernan, initiated this action against the defendant, Alex Azar,

in his official capacity as Secretary of the United States Department of Health and Human

Services ("HHS"), alleging multiple violations of the Freedom of Information Act ("FOIA"), 5

U.S.C. § 552 (2012). See generally Complaint ("Compl."). Currently before the Court are the

Defendant's Motion for Summary Judgment ("Def.'s Mot."), ECF No. 25, and the Plaintiff's

Opposition to Summary Judgment and Cross-Motion for Summary Judgment ("Pl.'s Mot."),

ECF No. 27. Upon careful consideration of the parties' submissions,[2] the Court concludes for

---

[1] Alex Azar is the current Secretary of the United States Department of Health and Human Services, see HHS Secretary, U.S. Dep't of Health & Human Services, https://www.hhs.gov/about/leadership/secretary/index.html (last visited June 7, 2018), and he is therefore substituted for Eric Hargan as the proper party defendant pursuant to Federal Rule of Civil Procedure 25(d). However, although Azar is now the named defendant in this case, the Court will reference the United States Department of Health and Human Services as the defendant throughout this opinion.

[2] In addition to filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."); (2) the Defendant's Statement of Material Facts as to Which There is No Genuine Issue ("Def.'s Facts"); (3) the defendant's first Declaration of Susan Cornell (May 4, 2016) ("First Cornell Decl."), ECF No. 26-1; (4) the defendant's Declaration of Katherine Uhl ("Uhl Decl."); (5) the defendant's Third [Vaughn] Index of Challenged Withholdings ("Third Vaughn Index"); (6) the Plaintiff's Memorandum of Points and Authorities in Support of Opposition to Summary Judgment and Cross-Motion for Summary Judgment ("Pl.'s Mem."); (7) the Plaintiff's Response to Agency Statement of Material Facts ("Pl.'s Resp.") and the Plaintiff's Statement of Material Facts Not

(continued . . .)

the reasons that follow that it must grant in part and deny in part without prejudice the defendant's motion for summary judgment and deny the plaintiff's cross-motion for summary judgment.

## I. BACKGROUND

The undisputed facts relevant to the parties' cross-motions are the following. <u>See generally</u> Pl.'s Resp. (not disputing any of the facts contained in the defendant's statement of facts); Def.'s Resp. (not disputing any of the facts contained in the plaintiff's statement of facts). The "[p]laintiff . . . is a Roman Catholic Priest who served for two decades as a Roman Catholic chaplain within the HHS, National Institute of Health (NIH) Clinical Center's Department of Spiritual Ministry, Department of Spiritual Care ('SMD')." Pl.'s Facts ¶ 1. "In 2007, the NIH Clinical Center assembled an outside panel of experts in spiritual ministry chaplaincy to review the operations of the Department of Spiritual Ministry and make recommendations for the policies and practices to ensure that [it] met the best standards for professional spiritual ministry practice." <u>Id.</u> ¶ 2. "As a staff chaplain at the NIH Clinical Center, [the plaintiff] participated in the [ ] 2007 [o]perational [r]eview discussions with the outside experts." <u>Id.</u> ¶ 7; <u>see also</u> <u>id.</u> ¶ 8 (noting some of the ways in which the plaintiff participated in the operational review). Ultimately, "[t]he review panel made recommendations to HHS. However, not all of those

---

(. . . continued)
in Dispute ("Pl.'s Facts"); (8) the Declaration of Rev. Henry G. Heffernan ("Heffernan Decl."); (9) the defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Cross-Motion for Summary Judgment and in Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Def.'s Reply"); (10) the Defendant's Response to Plaintiff's[ ]Statement of Material Facts Not in Dispute ("Def.'s Resp."); (11) the defendant's Declaration of Gorka Garcia-Malene ("Garcia-Malene Decl."); (12) the defendant's Declaration of John M. Pollack ("Pollack Decl."); (13) the defendant's Declaration of David K. Henderson ("Henderson Decl."); (14) the defendant's Declaration of Laura M. Lee ("Lee Decl."); (15) the defendant's Supplemental Declaration of Gorka Garcia-Malene ("Garcia-Malene Supp. Decl."); (16) the defendant's second Declaration of Susan Cornell (Apr. 22, 2016) ("Second Cornell Decl."), ECF No. 34-1; (17) the Plaintiff's Reply Brief in Support of Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Reply"); (18) the Supplemental Declaration of Rev. Henry G. Heffernan ("Heffernan Supp. Decl."); (19) the defendant's third declaration of Susan Cornell (Dec. 14, 2016) ("Third Cornell Decl."), ECF No. 21-1; and (20) the Plaintiff's Praecipe Regarding <u>Vaughn</u> Index and Document Search ("Praecipe").

recommendations were communicated to the chaplains." Id. ¶ 9. Based on the panel's

recommendations, the Clinical Center began considering changes to its operations and policies.

See id. ¶¶ 10–18 (discussing team meetings and the use of focus groups facilitated by an outside

consultant to determine what changes were necessary). The plaintiff "retired from HHS in

2013." Id. ¶ 1.

> On March 19, 2014, the plaintiff submitted to the defendant a FOIA request
>
> seeking certain specified records concerning [(1)] the [o]perational [r]eview of the Department of Spiritual Ministry that occurred in approximately July 2007, [(2)] the Clinical Research Advisory Board [m]eeting that occurred in approximately September 2007, [(3)] the Marit 2008-2009 Organization Development Focus Group Study of the Department of Spiritual Ministry/Department of Spiritual Care, conducted by Diana Marit Kunkel, Ph.D., and (4) all current approved policies, procedures and standards of practice . . . specific to the Department of Spiritual Ministry/Department of Spiritual Care.

Def.'s Facts ¶ 1; see also Pl.'s Resp. ¶ 1 (not disputing these facts). On July 22, 2014, the

defendant provided the plaintiff with an initial response to his FOIA request by "ma[king] an

interim release . . . consisting of [thirty-five] pages." Def.'s Facts ¶ 2; see also Pl.'s Resp. ¶ 2.

On September 25, 2014, the defendant "made a final release to [the] plaintiff consisting of 614

pages of responsive records," some of which contained information that was withheld pursuant

to Exemptions 5 and 6 of the FOIA. Def.'s Facts ¶ 3; see also Pl.'s Resp. ¶ 3. "On October 29,

2014, [the p]laintiff appealed [the d]efendant's 'final response'" internally according to the

defendant's FOIA procedures, Pl.'s Facts ¶ 26; see also Def.'s Resp. ¶ 26, and on December 17,

2015, while the defendant was processing that appeal, the plaintiff filed his Complaint

commencing this case, see Pl.'s Facts ¶ 28; see also Def.'s Resp. ¶ 28.

After the filing of this case, "[o]n April 22, 2016, the [d]efendant produced its first

Vaughn Index and sworn declaration." Pl.'s Facts ¶ 30; see also Def.'s Resp. ¶ 30. The plaintiff

challenged certain discrepancies in the defendant's Vaughn Index, "asked for clarification

regarding missing explanations for [certain] redactions," and requested that the defendant conduct "a search for records responsive to [certain i]tems . . . and [to produce] a list of records that appear[ed] to be missing." Pl.'s Facts ¶¶ 32–33; see also Def.'s Resp. ¶¶ 32–33. The defendant agreed to conduct the additional search for responsive documents requested by the plaintiff and to provide the plaintiff with the requested supplemental information. See Pl.'s Facts ¶ 36; see also Def.'s Resp. ¶ 36. On August 15, 2016, the defendant "produced its [s]econd Vaughn Index, [but] without a supplemental declaration." Pl.'s Facts ¶ 39; see also Def.'s Resp. ¶ 39. The plaintiff had largely the same concerns with the defendant's second Vaughn Index as already expressed, see Pl.'s Facts ¶¶ 40–42; see also Def.'s Resp. ¶¶ 40–42, and the defendant also failed to provide the plaintiff with the agreed-upon supplemental information, see Pl.'s Facts ¶¶ 43–44; see also Def.'s Resp. ¶¶ 43–44. The parties discussed the situation, and the defendant again agreed to provide the plaintiff with the supplemental information. See Pl.'s Facts ¶¶ 45–47; see also Def.'s Resp. ¶¶ 45–47. Because he did not receive the supplemental information as promised, on November 14, 2016, the "[p]laintiff filed a Motion for a Complete Vaughn Index." Pl.'s Facts ¶ 48; see also Def.'s Resp. ¶ 48. "Subsequent to that filing, the [defendant] agreed [ ] once again" to provide the plaintiff with the supplemental information, Pl.'s Facts ¶ 49; see also Def.'s Resp. ¶ 49, and on January 2, 2017, "[t]he Court affirmed that agreement," Pl.'s Facts ¶ 50; see also Def.'s Resp. ¶ 50.

On January 31, 2017, the defendant produced "its [t]hird Vaughn Index and [an additional] declaration from [its a]cting FOIA Officer." Pl.'s Facts ¶ 51; see also Def.'s Resp. ¶ 51. The defendant "also produced a few additional pages[] and re-produced documents previously produced without certain prior redactions." Pl.'s Facts ¶ 52; see also Def.'s Resp. ¶ 52. And, on February, 21, 2017, the defendant made an additional production that

corresponded with the Third <u>Vaughn</u> Index.  Pl.'s Facts ¶¶ 55, 57; <u>see also</u> Def.'s Resp. ¶¶ 55, 57.  Later, on July 19, 2017, the defendant filed its motion for summary judgment on the plaintiff's claims, asserting that it "conducted adequate searches for responsive records, and it [provided to the] plaintiff all of the records to which he is entitled."  Def.'s Mem. at 1.  The plaintiff then filed his opposition to the defendant's motion for summary judgment, along with his cross-motion for summary judgment, arguing that the defendant failed to conduct adequate searches and that it improperly withheld information pursuant to several FOIA exemptions.  <u>See generally</u> Pl.'s Mem.  Given that the parties have now fully briefed their cross-motions for summary judgment, these motions are now ripe for the Court's review.

## II. STANDARD OF REVIEW

The Court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party.  <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 150 (2000)).  The Court must therefore draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving party's evidence as true.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  The non-moving party, however, cannot rely on "mere allegations or denials."  <u>Burke v. Gould</u>, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting <u>Anderson</u>, 477 U.S. at 248).  Thus, "[c]onclusory allegations unsupported by factual data will not create a triable issue of fact."  <u>Pub. Citizen Health Research Grp. v. FDA</u>, 185 F.3d 898, 908 (D.C. Cir. 1999) (Garland, J., concurring) (alteration in original) (quoting <u>Exxon Corp. v. FTC</u>, 663 F.2d 120, 126–27 (D.C. Cir. 1980)).  If the Court concludes that "the nonmoving party has failed to make a

sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). At bottom, "in ruling on cross-motions for summary judgment, the [C]ourt shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." Shays v. FEC, 424 F. Supp. 2d 100, 109 (D.D.C. 2006).

"FOIA cases typically are resolved on a motion for summary judgment." Ortiz v. U.S. Dep't of Justice, 67 F. Supp. 3d 109, 116 (D.D.C. 2014); see also Defs. of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). "[The] FOIA requires federal agencies to disclose, upon request, broad classes of agency records unless the records are covered by the statute's exemptions." Students Against Genocide v. U.S. Dep't of State, 257 F.3d 828, 833 (D.C. Cir. 2001). In a FOIA action, the defendant agency has "[the] burden of demonstrating that the withheld documents are exempt from disclosure." Boyd v. U.S. Dep't of Justice, 475 F.3d 381, 385 (D.C. Cir. 2007) (citation omitted). The Court will grant summary judgment to the government in a FOIA case only if the agency can prove "that it has fully discharged its obligations under the FOIA, after the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." Friends of Blackwater v. U.S. Dep't of Interior, 391 F. Supp. 2d 115, 119 (D.D.C. 2005) (quoting Greenberg v. U.S. Dep't of Treasury, 10 F. Supp. 2d 3, 11 (D.D.C. 1998)). Thus, in a lawsuit brought to compel the production of documents under the FOIA, "an agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly[, or partially,] exempt [from disclosure].'" Students Against Genocide, 257 F.3d at 833 (omission in original) (quoting Goland v. CIA, 607

F.2d 339, 352 (D.C. Cir. 1978)).

## III. ANALYSIS

The plaintiff primarily challenges the adequacy of the defendant's searches for responsive records regarding the: (1) 2008–2010 SMD policies, (2) 2007 operational review, fall 2007 chaplain meetings, and 2007 Advisory Board meeting, (3) fall 2007 chief operating officer's Power Point presentation, and (4) John Pollack's e-mail responses to a July 27, 2009 e-mail. See Pl.'s Reply at 2–11. The plaintiff also challenges the defendant's withholdings pursuant to the deliberative process privilege of FOIA Exemption 5, see id. at 12–21, and the adequacy of the defendant's explanations provided in its Vaughn Index, see id. at 22–30.[3] The Court will address each of the plaintiff's challenges in turn.

### A. The Adequacy of the Defendant's Searches

"The adequacy of an agency's search is measured by a standard of reasonableness, and is dependent upon the circumstances of the case." Truitt v. U.S. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990) (internal quotation marks omitted). To satisfy its burden to show that no genuine issue of material fact exists as to the adequacy of its search, the agency must show that each agency component "has conducted a search reasonably calculated to uncover all relevant documents," Elliot v. U.S. Dep't of Agric., 596 F.3d 842, 851 (D.C. Cir. 2010) (quoting Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983)), and it may make this showing based on affidavits or declarations submitted in good faith, provided that the affidavits or declarations explain in reasonable detail the scope and method of the search, see Morley v.

---

[3] In his cross-motion, the plaintiff had also contested the Agency's withholdings pursuant to FOIA Exemption 5's attorney-client privilege and FOIA Exemption 6. See Pl.'s Mem at 38, 39. In his reply in support of his cross-motion, the plaintiff states that he "no longer disputes" these withholdings "[a]fter reviewing the defendant's] additional explanations" regarding these withholdings provided in the Garcia-Malene declaration. Pl.'s Reply at 30. Accordingly, given the plaintiff's withdrawal of these challenges, the Court need not consider these challenges in its analysis.

CIA, 508 F.3d 1108, 1116 (D.C. Cir. 2007) (citing Goland, 607 F.2d at 352). "In the absence of contrary evidence, such affidavits or declarations are sufficient to demonstrate an agency's compliance with [the] FOIA." North v. U.S. Dep't of Justice, 774 F. Supp. 2d 217, 222 (D.D.C. 2011) (citing Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982)). There is no requirement that an agency's search every record system in response to a FOIA request; rather, it may limit its search to only those locations where responsive documents likely are maintained. See Porter v. CIA, 778 F. Supp. 2d 60, 69 (D.D.C. 2011) (holding that there "[was] no genuine issue as to the adequacy of the [agency's] search" given that it searched the "likely databases for responsive documents"). The question a court must answer in considering the adequacy of an agency's search is "not whether other responsive documents may exist, but whether the search itself was adequate." Moore v. Bush, 601 F. Supp. 2d 6, 13 (D.D.C. 2009) (citing Steinberg v. U.S. Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994)). However, if the record "leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." Belltranena v. Clinton, 770 F. Supp. 2d 175, 183 (D.D.C. 2011) (quoting Truitt, 897 F.2d at 542).

### 1. The SMD's Clinical Center Policies from 2008 Through 2010

The plaintiff first contends that the defendant failed to "search[] for Clinical Center policies maintained about NIH chaplains in the Department of Spiritual Care/Ministry, or the SMD policies from 2008–2010 resulting from the [o]perational [r]eview [a]ction [p]lan." Pl.'s Mem. at 11–12. Specifically, the plaintiff argues that the search was unreasonable because (1) "such policies must exist and should have been produced had the [defendant] conducted an appropriate search," id. at 12, (2) that the defendant's hard copy search for such policies was limited to its 2014 policies, see id. at 14, and (3) that the defendant's electronic search was limited to the calendar year 2007, see id., and did not include search terms "reasonably likely to

uncover such policies," Pl.'s Reply at 3; <u>see also</u> Pl.'s Mem. at 14. Thus, according to the plaintiff, the defendant "failed to perform a good faith search of all potential locations for responsive records, in both electronic and hard copy format, using reasonably-tailored search terms and the relevant time period at issue." Pl.'s Mem. at 14.

The Court concludes, however, that the defendant "conducted a search reasonably calculated to uncover all relevant documents," <u>Elliot</u>, 596 F.3d at 851 (citation omitted), and therefore, the defendant's search for the Clinical Center's policies from 2008 through 2010 was adequate. The Court begins its analysis with the appreciation that "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search," <u>Iturralde v. Comptroller of Currency</u>, 315 F.3d 311, 315 (D.C. Cir. 2003) (citing <u>Steinberg</u>, 23 F.3d at 551). And, "[i]n this [C]ircuit, it is clear that a plaintiff's unsubstantiated belief that missing records exist cannot demonstrate the inadequacy of an agency's search[, and this] [ ] Circuit has dismissed as 'mere speculation' similar arguments from plaintiffs that the agency did not locate documents that the plaintiffs suspected to exist." <u>Parker v. U.S. Immig. & Customs Enf't</u>, 238 F. Supp. 3d 89, 102 (D.D.C. 2017) (quoting <u>Baker & Hostetler LLP v. U.S. Dep't of Commerce</u>, 473 F.3d 312, 318 (D.C. Cir. 2006)). Thus, as the defendant correctly notes, the issue the Court must resolve is whether the defendant's search for the requested policies was adequate, not whether those policies in fact exist. <u>See</u> Def.'s Reply at 4. Consequently, contrary to the plaintiff's proposition that these policies must exist, <u>see</u> Pl.'s Mem. at 12–13 (reaching this conclusion because "there was every indication at the time that the SMD was issuing new policies and procedures as a result of the [o]perational review," and because the Joint Commission Standards require hospitals to have formal policies governing each department of a hospital"); <u>see also</u> Pl.'s Reply at 4 (alleging that the SMD "changed its

practices regarding the chaplains' assignments" as a result of the 2007 operational review), the plaintiff's conjecture and speculative arguments that policies that must have been adopted have not been produced has no bearing on the Court's determination of whether the defendant's search was adequate, see Parker, 238 F. Supp. 3d at 103 (holding that the plaintiff's "conjecture about the possible existence of other documents fail[ed] to show that the agency's search was inadequate"). In any event, John M. Pollack, the Chief of the Spiritual Care Department, see Pollack Decl. ¶ 1, affirmed that "[n]o new policies were put into practice as a result of the 2007 operational review," id. ¶ 3. Additionally, Laura M. Lee, the Director of the Office of Patient Safety and Clinical Quality at NIH, see Lee Decl. ¶ 1, has represented that

> [t]he Joint Commission standards do not explicitly and prescriptively direct what information should be included in the portfolio of policies and procedures for spiritual care. The standards provided general guidance about the need to assure that each patient's spiritual needs are met. How the organization meets those needs must be determined by the hospital.

Id. ¶ 3.

Moreover, the plaintiff's challenges to the methods used by the defendant to search for the requested policies do not give the Court "substantial doubt as to the sufficiency of the [defendant's] search." Belltranena, 770 F. Supp. 2d at 183 (citation omitted). As support for its position that its search for the requested policies was adequate, the defendant submitted the declarations of Katherine Uhl, the NIH's former acting FOIA officer, see Uhl Decl. ¶ 1, and Gorka Garcia-Malene, the NIH's current acting FOIA officer, see Garcia-Malene Decl. ¶ 6(1).[4]

---

[4] The defendant also submitted the declaration of Susan Cornell, who was the NIH's FOIA officer prior to Uhl. See generally First Cornell Decl. In her declaration, Cornell notes that "[t]he [Clinical Center] searched for responsive documents where they were likely to be located, namely on its 'share[d] drive' as well as the electronic, hard copy and e[-]mail files of those [ ] employees who [were] in position to possess such records." Id. ¶ 7. This search was limited to "records created/maintained during May[ through ]October 2007," id. ¶ 6, and for the e-mail files, "[t]he [Clinical Center] utilized the search term 'spiritual ministry,'" id. ¶ 7. However, Cornell explained that this search was performed "for records responsive to all of the [plaintiff's FOIA] requests," except for two items that are not related to the plaintiff's request for the Clinical Center's policies from 2008–2010. Id. ¶ 6.

In her declaration, Uhl states that the Clinical Center "search[ed] its files for records related to policies and guidelines from 2008–2010," and that "all [of the Spiritual Care Department's] policies and guidelines are housed in a policy book within the department." Uhl Decl. ¶ 4(1). Uhl also states that "[t]here are no other places to search for such information that would reasonably be expected to have a policy or guideline not contained in this policy book," and that "[t]his book was searched for records considered responsive." Id.[5] Furthermore, Garcia-Malene represents that, in response to "the numerous allegations of insufficient searches, on November 8, 2017, the [Spiritual Care Department] again searched the policy book, and then also performed an electronic search and a search for paper files for policies and guidelines from 2008–2010." Garcia-Malene Decl. ¶ 6(1). Garcia-Malene also represents that

> Pollack's computer hard drive, network drive and [the Spiritual Care Department's] shared drive were searched, as documents created in connection with policies could be on the IT network drive assigned to the department Chief and/or the department shared drive. During this search, the individual keywords "policies", "policy", "op review", "operational review", "SMD", "Spiritual Ministry", "Pollack", "Maureen Gormley", "Gormley", "Operational Review response", and "operational review action plan" were used.

Id. Additionally, "Pollack [ ] searched his office file cabinets and overhead bin, as any work product of this nature could be filed in the Chief's office. File folders labeled 'operational review' and 'policies' were searched on October 2, 2017, but no new records were found during these . . . searches." Id.

Based on these representations, the Court finds that the defendant has sufficiently established that its search for the requested policy documents was adequate and reasonably calculated to discover documents responsive to the requests. See Valencia-Lucena v. U.S. Coast

---

[5] The defendant also conducted a search of "electronic and paper files for the policy documents" using "SMD, Spiritual Ministry, [and] Gormley" as search terms. Uhl decl. ¶ 6. This search did not uncover any responsive documents. See id.

Guard, 180 F.3d 321, 326 (D.C. Cir. 1999) ("[T]he court may rely on '[a] reasonably detailed [declaration], setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'" (second alteration in original) (quoting Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990))).  The defendant's declarations "explain[ ] in adequate detail that all systems likely to contain responsive records were searched."  Hall v. CIA, 881 F. Supp. 2d 38, 58 (D.D.C. 2012). In fact, the defendant conducted multiple searches of the Spiritual Care Department's policy book, the only place likely to contain the Clinical Care policies sought by the plaintiff.  See Uhl Decl. ¶ 4(1); see also Garcia-Malene Decl. ¶ 6(1).  And, the defendant went beyond the policy book, searching electronic files using reasonably tailored search terms and paper files of employees likely to possess the policies sought by the plaintiff.  See Airaj v. United States, No. 15-983 (ESH), 2016 WL 1698260, at *7 (D.D.C. Apr. 27, 2016) ("[T]he [ ] Circuit has held that the performance of additional searches following an agency's initial response to a FOIA request not only does not discredit the original search, but to the contrary, actually indicates good faith and 'suggest[s] a stronger . . . basis for accepting the integrity of the search.'" (omission and third alteration in original) (quoting Meeropol v. Meese, 790 F.2d 942, 953 (D.C. Cir. 1986))). Consequently, it cannot be said that the defendant did not "ma[ke] a 'good faith effort to conduct a search . . . using methods which can be reasonably expected to produce the information requested."  Dibacco v. U.S. Army, 795 F.3d 178, 188 (D.C. Cir. 2015) (omission in original) (quoting Oglesby, 920 F.2d at 68).

It is also significant that the plaintiff does not contest any of the representations made by the defendants' declarants regarding their searches, see Pl.'s Reply at 2–4, or produce any "'countervailing evidence' as to the adequacy of the [defendant's] search[es]," Iturralde, 315

F.3d at 314 (quoting <u>Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency</u>, 610 F.2d 824, 836 (D.C. Cir. 1979)), or assert that the defendant did not make a good faith search, <u>see</u> <u>Defs. of Wildlife v. U.S. Dep't of Interior</u>, 314 F. Supp. 2d 1, 8 (D.D.C. 2004) ("An adequate [declaration] can be rebutted only with evidence that the agency's search was not made in good faith." (citation and internal quotation marks omitted)).  Rather, the plaintiff primarily argues that the defendant's electronic search did not utilize search terms that were "likely to result in locating responsive records."  Pl.'s Reply at 4; <u>see also</u> <u>id.</u> at 3–4 (listing sixteen search terms that the defendant should have employed in order for the Court to conclude that the defendant conducted a thorough search).[6]  However, "[a]gencies generally have 'discretion in crafting a list of search terms' as long as they are 'reasonably tailored to uncover documents responsive to the FOIA request.'"  <u>Tushnet v. U.S. Immig. & Customs Enf't</u>, 246 F. Supp. 3d 422, 434 (D.D.C. 2017) (quoting <u>Bigwood v. U.S. Dep't of Def.</u>, 132 F. Supp. 3d 124, 140–41 (D.D.C. 2015)).  And, "[w]here the agency's search terms are reasonable, the Court will not second guess the agency regarding whether other search terms might have been superior."  <u>Id.</u> (internal quotation marks omitted) (quoting <u>Liberation Newspaper v. U.S. Dep't of State</u>, 80 F. Supp. 3d 137, 146 (D.D.C. 2015)).

Here, although the defendant does not explain why it selected the search terms it used, <u>see</u> Garcia-Malene Decl. ¶ 6(1), the Court nonetheless finds the search terms that were employed were reasonable.  The Court so concludes because after comparing the search terms utilized in response to the plaintiff's FOIA request as modified by the Court's January 2, 2017 Minute

---

[6] In his declaration, the plaintiff also asserted that the defendant's search was not adequate because the defendant did not search the "primary institutional file" for the Deputy Director for Clinical Care Center of NIH, <u>see</u> Heffernan Decl. ¶ 28(f).  In response, the defendant submitted the declaration of David K. Henderson, the Deputy Director for Clinical Care and Associate Director for Quality Assurance and Hospital Epidemiology at NIH, <u>see</u> Henderson Decl. ¶ 1, who represented that "[t]he Deputy Director of Clinical Care does not maintain a file of Clinical Center approved policies," <u>id.</u> ¶ 3.

Order,[7] "it [ ] appears more than likely that the terms utilized would identify responsive documents," Bigwood, 132 F. Supp. 3d at 141; see also Pl.'s Reply at 4 (including in his list of proposed search terms, some of the search terms the defendant actually used (i.e., "policy", "policies," and "[a]ction [p]lan")).  Moreover, even though "a FOIA petitioner cannot dictate the search terms [that must be used in response to his] . . . FOIA request," Bigwood, 132 F. Supp. 3d at 140, there is no indication that the plaintiff requested the defendant to employ these proposed search terms either in his FOIA request or subsequent negotiations regarding the defendant's searches for responsive documents.  And "[t]he plaintiff's insistence on [his] own preferred search terms does not undermine the reasonableness of the [defendant's] search terms." Agility Pub. Warehousing Co. K.S.C., v. Nat'l Sec. Agency, 113 F. Supp. 3d 313, 339 (D.D.C. 2015) (emphasis in original).  Thus, the Court finds the search terms used by the defendant to search for the Clinical Center's policies from 2008–2010 were reasonable and adequate.

In sum, "[t]he plaintiff has presented no grounds for upsetting the presumption of regularity afforded to [the defendant's] declarations, and the Court finds that the declarations are reasonably detailed and the [defendant's] search [for any policies from 2008–2010] was reasonably calculated to lead to [the discovery of] responsive documents." Id. at 340.  Accordingly, the Court must grant this aspect of the defendant's motion for summary judgment and deny this component of the plaintiff's cross-motion for summary judgment.

### 2.  Records Regarding the 2007 Operational Review

The plaintiff also argues that the defendant "performed an inadequate search for responsive e[-]mails, notes, statements, correspondence, and records pertaining to the 2007 [o]perational [r]eview . . . and the Clinical Research Advisory Board meeting in September

---

[7] To resolve the plaintiff's motion for a complete Vaughn Index, the parties agreed to modify the scope of the plaintiff's FOIA request and to limit the defendant's search efforts to certain parameters.  See generally Praecipe.

2007." Pl.'s Mem. at 15. In response, the defendant maintains that it conducted multiple searches for documents responsive to this aspect of the plaintiff's FOIA request that were adequate under the FOIA. See Def.'s Reply at 10.

To demonstrate that its search was adequate and reasonable, the defendant submitted Garcia-Malene's declaration, which represents that the defendant performed searches on January 9, 2017, and on November 8, 2017, for documents responsive to this aspect of the plaintiff's FOIA request. See Garcia-Malene Decl. ¶ 6(2). On January 9, 2017, Maureen Gormley, Sandy Seubert, Pollack, Dana Kelley, Dominic Ashkar, and Diana Gomez de Molina, "the individuals most likely to have responsive records," each conducted a "search for e-mail correspondence from the fall of 2007, involving the Chief Operating Officer, her staff, and chaplains, that discussed the problems that arose when the chaplains attempted to implement the tentative assignments to nursing units, and comply with the activities in the Operational Review Team's recommendations." Id. (internal quotation marks omitted). This electronic search employed the following search terms: "Heffernan," "Gormley," "Checking in," "Spiritual Ministry," and "2007." Id. (referring to Uhl's declaration). "[T]o ensure [that] a comprehensive search was completed," on November 8, 2017, the defendant requested that the same individuals conduct "a new search for records in this category." Id. These individuals "search[ed] their computer[s] [and] network files, both shared and personal, outlook (e[-]mail) folders, paper files, and any other place that would likely house responsive documents," and utilized the following search terms: "Dominic Ashkar," "Diana Gomez de Molina," "Dana Kelley," "Owen Fitzgerald," "Spiritual Ministry," "Operational Review," "Fall 2007," "Spiritual Ministry Operational Review," "Maureen Gormley," "Staff assigned departments," "Walter Jones," and "Staff meetings." Id. According to Garcia-Malene, these search terms were selected because they

"would likely have located all responsive records as they all relate to the SMD operational review and/or are persons associated with [the Spiritual Care Department] who would have been privy to the changes of [the Spiritual Care Department]." Id. Lastly, Garcia-Malene stated that "[t]he word 'and' was not included with respect to these search terms, nor was any other limitation imposed in connection with these search terms." Id.[8]

The Court finds that the defendant's search for records regarding the 2007 operational review, chaplain staff meetings, and Advisory Board meetings was reasonable and adequate. The Garcia-Malene declaration "explain[s] in reasonable detail the scope and method of the search conducted by the [defendant sufficient] to demonstrate compliance with the obligations imposed by the FOIA." Perry, 684 F.2d at 127. The Garcia-Malene declaration also "set[s] forth the search terms and the type of search performed, and aver[s] that all files likely to contain responsive materials . . . were searched." Valencia–Lucena, 180 F.3d at 326 (citation omitted). Because, the Garcia-Malene declaration is entitled to be "accorded a presumption of good faith," SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and the plaintiff has not produced any "countervailing evidence" to rebut this presumption, Iturralde, 314 F.3d at 314 (citation and internal quotation marks omitted); see also Pl.'s Reply at 4–8, the Garcia-Malene declaration "leave[s] . . . this Court confident that the [defendant] ha[s] conducted searches reasonably calculated to uncover all relevant documents," Defs. of Wildlife, 623 F. Supp. 2d at 91.

Despite not contesting the reasonableness of Garcia-Malene's declaration, the plaintiff contends that the defendant's search was deficient (1) because it "did not locate records of the

---

[8] The January 9, 2017 search located eleven pages of records responsive to this component of the plaintiff's FOIA request, which were produced to the plaintiff. See Garcia-Malene Decl. ¶ 2. The November 8, 2017 search disclosed "[n]o new records." Id.

fall 2007 meetings between [Chief Operating Officer] Gormley and the chaplains about the new

nursing unit assignments," records which he "knows . . . exist because he saw them during his

employment with [HHS]," Pl.'s Mem. at 17 (recalling details of the assignment spreadsheets),

and (2) because it did not utilize "search terms that would be likely to result in the 2007 chaplain

assignment spreadsheets, Advisory Board meetings, chaplain meetings records, or records

related to the implementation or adoption of the [Operational Review Team] report," Pl.'s Reply

at 5. However, the Court finds these arguments unpersuasive.

      Regarding the plaintiff's challenge to the defendant's search based on the defendant's

inability to locate records related to the 2007 chaplain meetings about new nursing unit

assignments, see Pl.'s Mem. at 17, as the Court previously noted, "a search is not inadequate

simply because it failed to yield every document that [the p]laintiff seeks," Shores v. FBI, 185 F.

Supp. 2d 77, 82 (D.D.C. 2002); see also SafeCard Servs., Inc., 926 F.2d at 1201 ("When a

plaintiff questions the adequacy of the search an agency made in order to satisfy its FOIA

request, the factual question it raises is whether the search was reasonably calculated to discover

the requested documents, not whether it actually uncovered every document extant."). In

addition, "[i]t is long settled that the failure of an agency to turn up one specific document in its

search does not alone render [the] search inadequate . . . [because] particular documents may

have been accidentally lost or destroyed, or a reasonable and thorough search may have missed

them." Judicial Watch, Inc. v. U.S. Dep't of State, 177 F. Supp. 3d 450, 458 (D.D.C. 2016)

(omission and first and third alterations in original) (quoting Iturralde, 315 F.3d at 315).

Furthermore, as the defendant correctly notes, see Def.'s Reply at 9–10 (asserting that "[t]he fact

that certain documents were passed out to individuals in 2007, does not mean that any of those

documents were still in[ ]existence in March of 2014[,] when [the] plaintiff's FOIA request was

made" (citation omitted)),

> [i]t is well settled that a FOIA request pertains only to documents in the possession of the agency at the time of the FOIA request. That an agency once possessed responsive documents but does not at the time of the FOIA request does not preclude summary judgment in the agency's favor. FOIA does not impose a document retention requirement on agencies.

Landmark Legal Found. v. EPA, 272 F. Supp. 2d 59, 66 (D.D.C. 2003) (citations omitted); see also DiBacco, 795 F.3d at 190 ("FOIA is not a wishing well; it only requires a reasonable search for records an agency actually has."); Wadelton v. U.S. Dep't of State, 208 F. Supp. 3d 20, 27 (D.D.C. 2016) ("While an agency violates its FOIA obligations by destroying records once a FOIA request has been received, any previous failure to preserve records related to pending or imminent litigation is not a FOIA violation."). Thus, the Court does not find this first challenge by the plaintiff convincing.

The plaintiff's challenge to the search terms used by the defendant to conduct its search is also unpersuasive because the Court finds those search terms "reasonably calculated to lead to responsive documents." Bigwood, 132 F. Supp. 3d at 140. Comparing the search terms used to conduct the search to the scope of the plaintiff's FOIA request as limited by the parties' agreement, see Third Cornell Decl. at ¶ 2(d)–(e) (limiting the search to the tentative staff assignments); see also Praecipe (noting that the "[d]efendant has committed in a sworn declaration to provide all of the substantive relief sought in [the p]laintiff's proposed order"), "it certainly appears more than likely that the terms utilized would identify responsive documents," Bigwood, 132 F. Supp. 3d at 141, regarding the operational review and tentative staff assignments.

Nonetheless, the plaintiff argues that the defendant's search terms "were too limited, not tailored to the specific requests, and unlikely to result in the production of all responsive

documents," Pl.'s Reply at 6, because some of the search terms "were [ ] improperly limited in scope and time," Pl.'s Mem. at 16 (referring to the search terms provided in the Uhl declaration), and because "[o]ther terms were improperly compounded" or do not relate to the topics corresponding to this aspect of his FOIA request, Pl.'s Reply at 6 (referring to the search terms used in the November 8, 2017 search).  Relying on Coffey v. Bureau of Land Management, 249 F. Supp. 3d 488 (D.D.C. 2017), the plaintiff contends that using the selected individuals' e-mail addresses, see id. at 6, and a Boolean search protocol, see id. at 7 (citing Coffey for this assertion as well),[9] "might be particularly effective," see id. at 6, and would "satisfy the [defendant's] burden of showing [that] a reasonable search was conducted," id. at 7.  However, the plaintiff's reliance on Coffey is misplaced.  In Coffey, the plaintiff's FOIA request sought all of two custodians' communications with certain individuals without any limitation on the scope of that request.  See 249 F. Supp. 3d at 498.  But, the agency conducted its search using search terms limited to one particular topic without using names or e-mail addresses.  See id. at 498–99.  The Court reasoned that using the individual names and e-mail addresses "would presumably uncover all electronic correspondence responsive to [the plaintiff's] request."  Id. at 499.  Here, however, the plaintiff has not requested all electronic correspondence, but, as noted above, has limited this aspect of his FOIA request to records related to the tentative staff assignments.  Thus, using e-mail addresses would be overly encompassing, particularly since the defendant conducted its search using the names of the individuals likely to contain responsive records.  See Garcia-Malene Decl. ¶ 6(2).

Moreover, regarding the plaintiff's contention that the defendant should not have used compounded search terms, the defendant attests that it did not use such limitation in its search.

---

[9] The plaintiff notes that a "Boolean" search is a search that "indicates the presence of an 'or' relationship between [terms] as opposed to an 'and' relationship."  Pl.'s Reply at 7 (citation and internal quotation marks omitted).

See id. (noting that its search was not limited by the use of "and").  In any event, the question for the Court to resolve is not whether a Boolean search protocol would have been more appropriate, as the plaintiff suggests.  See Pl.'s Reply at 7.  Rather, the Court must determine whether the search terms used were "reasonably calculated to lead to responsive documents."  Bigwood, 132 F. Supp. 3d at 140.  And, the Court finds that the search terms selected pass muster under that standard.  Accordingly, the Court must grant the defendant's motion for summary judgment as to the adequacy of its search for these records, and deny the corresponding aspect in the plaintiff's cross-motion for summary judgment.

### 3.  The Fall 2007 Chief Operating Officer PowerPoint Presentation

The plaintiff next argues that the defendant did not conduct an adequate "search for the Fall 2007 [Chief Operating Officer] Power[]Point presentation."  Pl.'s Mem. at 18.  In particular, the plaintiff states that "[t]he requested document is a Power[]Point presentation given to the staff chaplains in a meeting after the Friday, Sept[ember] 21, 2007 meeting of the NIH Clinical Center's Advisory Board for Clinical Research."  Id.  According to the plaintiff, "[t]he presentation quickly listed results and decisions on the Operational Review Report findings and recommendations," id., and he recalls the presentation "includ[ing] a series of Power[]Point slides with general information on the [o]perational [r]eview, including the full list of the participating members of the Operational Review team," id. at 19 (citation and internal quotation marks omitted).  The defendant in response insists that "[t]he record in this case demonstrates that [it] has performed a more than reasonable search for the [Power Point] presentation at issue."  Def.'s Reply at 10–11; see also id. at 10 (asserting that it has performed "four searches for this document") (emphasis removed).  As a result of these searches, the defendant produced to the plaintiff a two-page Power Point presentation in full and a separate twenty-one page Power

Point presentation with certain redactions.  See Garcia-Malene Decl. ¶ 6(3); see also

Garcia-Malene Supp. Decl. ¶ 5.

As support for its position that it conducted an adequate search for the requested

presentation, the defendant again relies on the multiple declarations it submitted.  First, Uhl

represents that Gormley

> search[ed] her files for the [Power Point] presentation on the [o]perational [r]eview,
> presented to the [ ] chaplains approximately a week or so after the September
> [Advisory Board Clinical Research] meeting, in which the findings of the
> Operational Review Team's report was presented, and the Clinical Center
> Director's decisions on implementing certain recommendations of the
> [Operational] Review Team.

Uhl Decl. ¶ 4(3) (referring to a search conducted in 2016).  Uhl further notes that this search

included "[a] search of [ ] Gomley's electronic files in an archived Spiritual Ministry folder."  Id.

Garcia-Malene adds that "Gormley was the person to most likely have maintained or have access

to the [Power Point] presentation from the Fall 2007 meeting," and she "conduct[ed] a search of

her computer, e[-]mail, and paper files for responsive records" in "March 2014, July 2016, and

December 2016."  Garcia-Malene Decl. ¶ 6(3).  In addition, "[o]n November 8, 2017, another

search for responsive records was conducted," which involved searching the

"[c]omputer/network, outlook, and paper files . . . using individual keywords 'Dominic Ashkar',

'Diana Gomez de Molina', 'Dana Kelley', 'Owen Fitzgerald', 'Spiritual Ministry', 'Operational

Review', 'Fall 2007', "Spiritual Ministry Operational Review', 'Maureen Gormley', 'Staff

assigned department', 'Walter Jones', and 'Staff meetings.'"  Id.  Although this search disclosed

"[n]o new records[,] . . . an item by item search of [ ] Pollack's network files" located the

twenty-one page Power Point presentation that was produced to the plaintiff.  Id.

The Court finds that the defendant's search for the Chief Operating Officer's Power Point

presentation was not sufficiently adequate for several reasons.  At the outset, the Court notes

that, although the plaintiff seeks to challenge the adequacy of the defendant's search regarding this component of his FOIA request, he does not assert any basis supporting that challenge.  See Pl.'s Mem. at 18–19; see also Pl.'s Reply at 8–10.  He merely claims that, based on his review of the two presentations produced, neither of them is the presentation he wants to obtain.  See Pl.'s Mem. at 18–19; see also Pl.'s Reply at 9–10.  But, as this Court has previously noted, "the adequacy of a search is 'determined not by the fruits of the search, but by the appropriateness of [its] methods.'"  Hodge v. FBI, 703 F.3d 575, 580 (D.C. Cir. 2013) (alteration in original) (quoting Iturralde, 315 F.3d at 315); see also Reporters Comm. for Freedom of Press v. FBI, 877 F.3d 399, 408 (D.C. Cir. 2017) ("That a few responsive documents may have slipped through the cracks does not, without more, call into question the search's overall adequacy."); Mobley v. CIA, 806 F.3d 568, 583 (D.C. Cir. 2015) ("[A] search, under FOIA, is not unreasonable simply because it fails to produce all relevant material." (citation and internal quotation marks omitted)).  Consequently, to the extent that the plaintiff argues that the defendant's searches were inadequate because they did not produce the Power Point presentation sought, that argument has no merit.

Nonetheless, the Court finds that the defendant's declarations, taken together, do not provide the Court the minimum information needed for the Court to conclude that the defendant conducted a search "reasonably calculated to uncover all relevant documents." Valencia-Lucena, 180 F.3d at 325 (citation and internal quotation marks omitted).  Although the defendant's declarations sufficiently identify the search terms used and the locations searched, see, e.g., Garcia-Malene Decl. ¶ 6(3), they do not provide the requisite "averment that all locations likely to contain responsive records were searched," Powell v. IRS, 280 F. Supp. 3d 155, 162 (D.D.C. 2017); see also Oglesby, 920 F.2d at 68.  The defendant's declarants simply

state that "Gormley was the person to <u>most likely</u> [to] have maintained or have access to the [requested Power Point] presentation." Garcia-Malene Decl. ¶ 6(3) (emphasis added). However, as the Circuit has explained, merely searching the location "'most likely' [to contain responsive records] is not the relevant metric." <u>DiBacco</u>, 795 F.3d at 190; <u>see also</u> <u>Mobley</u> 806 F.3d at 582 (noting that "[h]ad the [agency] only searched the records 'most likely' to contain responsive records, its search would be inadequate"). Therefore, for summary judgment to be granted in its favor, the defendant was required to submit reasonable detailed declarations "averring that all files likely to contain responsive materials (if such records exist) were searched," <u>Oglesby</u>, 920 F.2d at 68, which the defendant has not done. Accordingly, the Court cannot enter summary judgment in favor of the defendant, but the Court "will permit [the defendant] to supplement the record to cure [this] deficienc[y] and to renew its motion for summary judgment as to the adequacy of its search" regarding this component of its response to the plaintiff's FOIA request. <u>Elec. Privacy Info. Ctr. v. FBI</u>, 235 F. Supp. 3d 207, 213 (D.D.C. 2017); <u>see also</u> <u>Judicial Watch, Inc. v. U.S. Dep't of Justice</u>, 185 F. Supp. 2d 54, 65 (D.D.C. 2002) ("[W]hen an agency's affidavits or declarations are deficient regarding the adequacy of its search, . . . the courts generally will request that the agency supplement its supporting declarations.").

### 4.  John Pollock's Response to the July 27, 2009 E-mail

Finally, with respect to the adequacy of the defendant's search efforts, the plaintiff argues that the defendant "did not perform a reasonable search," Pl.'s Mem. at 20, "for [all] e[-]mails relating to [ ] Pollack['s] response to a July 27, 2009, e[-]mail concerning 'the actions taken and planned dates for completion' of the Operational Review Action Plan, including a description of actions taken[ and] dates completed," <u>id.</u> at 19. From the plaintiff's perspective, the defendant's searches for this document "were not reasonably calculated to uncover requested records because

the individuals who searched e[-]mail and computer files used compound search terms," Pl.'s Reply at 11, or search terms "not likely to lead to the discovery of requested records," id. at 12 (addressing the defendant's use of a "single multi-word search term" for its December 28, 2016 search).

The defendant again relies on the multiple declarations it has submitted to demonstrate that its searches for these requested records were adequate. Uhl states that the SMD had Gormley, "the former Chief Operating Officer [ ] and her staff on board during the Fall of 2007, who are still with the [Clinical Care Center], to again search their files for records related to Pollack's response to [the] July 27, 2009 e[-]mail." Uhl Decl. ¶ 4(2). These individuals searched their "electronic, e[-]mail, and paper files . . . using the following terms: SMD, Spiritual Ministry, Pollack, Gormley, Operational Review response, operational review action plan, and 2009." Id.[10] And Garcia-Malene represents that, in December 2016, "Maria Joyce and Rachel Schacherer searched e[-]mail and computer files using [the previously identified] individual keywords," except for the term "operational review action plan." Garcia-Malene Decl. ¶ 6(4). They also searched the "electronic Office of the Director [ ] Share Drive folder tilted 'Operational Review' . . . for any files named 'Operational Review Response,' 'Operational Review Action Plan,' 'SMD,' [and] 'Spiritual Ministry.'" Id. Although no new records were located, see id., "[o]n December 28, 2016, [ ] Pollack conducted a search of his e[-]mails for [responsive] records . . . us[ing] 'operational review action plan'" as the only search term, id.[11]

Similar to the defendant's descriptions of its search efforts for the Power Point

_____

[10] According to the defendant, "[t]his search, originally conducted and completed in July 2016, produced [six] pages of responsive documents . . . [, and p]ortions of th[ose] records were redacted pursuant to FOIA Exemption 5's deliberative process privilege." Uhl Decl. ¶ 4(2).

[11] "A [six]-page document was located as a result of this search and provided to [the] plaintiff on January 31, 2017." Garcia-Malene Decl. ¶ 6(4).

presentation, the defendant's descriptions regarding its search efforts for Pollack's response to the July 27, 2009 e-mail "do[ ] not contain sufficient information for the [C]ourt to assess whether the [defendant] conducted a search reasonably calculated to uncover all responsive records." Elec. Privacy Info. Ctr., 235 F. Supp. 3d at 213.[12]  The deficiency results primarily from the defendant's declarations' failure to "aver[] that all locations likely to contain responsive records were searched," Powell, 280 F. Supp. 3d at 162, let alone any explanation of why the individuals selected or the databases searched were likely to lead to uncovering all responsive documents, see Valencia-Lucena, 180 F.3d at 325.  Moreover, although the defendant's declarations identify the search terms and databases searched, see, e.g., Garcia-Malene Decl. ¶ 6(4), they do not offer any explanation as to why the same search terms were not utilized for each of the defendant's searches concerning Pollack's response, see, e.g., id. (noting that Pollack only used one search term when conducting his search and that Joyce and Schacherer did not use the same individual keywords for all of their electronic searches).  And the fact that Pollack was able to locate responsive documents using one individual keyword term for his electronic search, see id., causes the Court to "second guess," Liberation Newspaper, 80 F. Supp. 3d at 146, whether the use of the other search terms used by Joyce and Schacherer would lead to Pollack locating additional responsive documents.  See Bigwood, 132 F. Supp.3d at 141 (acknowledging

---

[12] The parties dispute the proper scope of the request concerning the fourth category of documents.  See Def.'s Reply at 11 n.1 (asserting that the plaintiff's description on page nineteen of his memorandum "for all e[-]mails concerning [the] 2009 Pollack response" was not an accurate description of this aspect of the plaintiff's FOIA request as reflected in the Court's January 2, 2017 Minute Order); see also Pl.'s Reply at 10–11 (addressing the defendant's contention regarding the scope of this aspect of his FOIA request).  The defendant's position is correct, because the parties agreed to modify and limit the defendant's search to "Pollack's response," see Praecipe (referring to the December 14, 2016 Declaration of Susan Cornell); see also Third Cornell Decl. ¶ 9(2), and not "all e[-]mails concerning 2009 Pollack's response" as the plaintiff suggests, Pl.'s Mem. at 19.  This modified agreement was reflected in the Court's Order dismissing as moot the plaintiff's motion for a complete Vaughn Index, see January 2, 2017 Minute Order, and the plaintiff's attempt to seek documents outside of this modification through his cross-motion for summary judgment would be inappropriate, see Bonner v. U.S. Dep't of State, 928 F.2d 1148, 1152 (D.C. Cir. 1991) ("To require an agency to adjust or modify its FOIA responses based on post-response occurrences could create an endless cycle of judicially mandated processing.").

that the use of "the additional terms may have increased the possibility that additional responsive materials would be identified"); see also Tushnet, 246 F. Supp. 3d 435 (concluding that the agency's use of different search terms and parameters by office without explanation left the court "wondering" whether the agency's search was reasonably calculated).

In short, the defendant's declarations are not reasonably detailed to give the Court confidence that the defendant's searches adequately complied with its obligations under the FOIA. Accordingly, the Court must deny this component of the defendant's summary judgment motion; however, the Court will again allow the defendant to renew its summary judgment motion by supplementing the record with a reasonably detailed declaration or declarations that cure the deficiencies identified in its current declarations regarding the adequacy of its searches for this aspect of the plaintiff's FOIA request.[13]

## B. The Defendant's Withholdings Pursuant to FOIA Exemption 5

The remaining issues concern the parties' dispute regarding the defendant's withholdings of information pursuant to FOIA Exemption's 5 deliberative process privilege. The plaintiff first challenges the sufficiency of the defendant's descriptions of its withholdings provided in its Third Vaughn Index. See Pl.'s Mem. at 21 (asserting that the defendant's Third Vaughn Index is "plainly insufficient"); see also Pl.'s Reply at 22–23. The plaintiff then challenges the applicability of the deliberative process privilege as a proper basis for justifying the defendant's

---

[13] As the Court noted, the plaintiff also contends that the defendant's use of "compound[ed] search terms" was "not reasonably calculated to uncover [the] requested records." Pl.'s Reply at 11; see also id. at 12 (suggesting that the use of a Boolean search would be more appropriate). The defendant claims—albeit not in any of its declarations— that its December 2016 searches "did not improperly use compound search terms which could have improperly limited the documents retrieved," Def.'s Reply at 11. However, because the Court has concluded that the defendant's declarations do not contain the minimum contextual detail needed for it to determine whether the defendant's searches were adequate, it need not decide this issue at this time. Nonetheless, as the Court will have to determine whether the defendant's search terms were reasonable in its assessment of whether the defendant's searches were adequate upon the renewal of the defendant's summary judgment motion, the defendant should be mindful to address this issue in its supplemental declaration or declarations.

withholdings.  See Pl.'s Mem. at 25–37; see also Pl.'s Reply at 12–30.  The Court will address these challenges in turn.

### 1.  The Plaintiff's Challenge to the Defendant's Third Vaughn Index

As a threshold matter, the plaintiff argues that the defendant's Third Vaughn Index is inadequate for the defendant to satisfy its obligations under the FOIA because the index "does not contain the detailed analysis necessary for the Court and the [p]laintiff to test the [defendant's] claimed Exemption[]," and because it "improperly relies on conclusory, boilerplate reasons to justify its withholdings based on asserted claims of [the] 'deliberative process privilege.'"  Pl.'s Mem. at 21.  Although the defendant disputes the plaintiff's claim that the Third "Vaughn Index is confusing and insufficient," Def.'s Reply at 12, it nonetheless contends that this challenge "is moot" because the "Garcia-Malene Declaration addresses in detail each document [and the underlying basis for its withholding] that [the] plaintiff challenges," id. at 13 (maintaining that the Third Vaughn Index must be read in connection with the supporting declarations, particularly the Garcia-Malene declaration).

In responding to a FOIA request, "the agency has the difficult obligation [of] justify[ing] its actions without compromising its original withholdings by disclosing too much information[, and t]he Vaughn index provides a way for the defending agency to do just that."  Judicial Watch, Inc. v. FDA, 449 F.3d 141, 146 (D.C. Cir. 2006); see also id. ("By allowing the agency to provide descriptions of withheld documents, the index gives the court and the challenging party a measure of access without exposing the withheld information.").  Thus, as the Circuit has explained, "it is the function, not the form, of the index that is important."  Keys v. U.S. Dep't of Justice, 830 F.2d 337, 349 (D.C. Cir. 1987); see also Judicial Watch, Inc., 449 F.3d at 146 (discussing the purpose of the Vaughn index and noting that "the touchstone of [the] analysis" is

"on the functions of the Vaughn index, not the length of the document descriptions").

Moreover, an "agency may even submit other measures in combination with or in lieu of the index itself," Judicial Watch, Inc., 449 F.3d at 146, "so long as they give the reviewing court a reasonable basis to evaluate the claim of privilege," Gallant v. NLRB, 26 F.3d 168, 172–73 (D.C. Cir. 1994) (citation and internal quotation marks omitted).  Indeed, "[a]ny measure will adequately aid a court if it 'provide[s] a relatively detailed justification, specifically identif[ies] the reasons why a particular exemption is relevant[,] and correlate[es] those claims with the particular part of a withheld document to which they apply."  Judicial Watch, Inc., 449 F.3d at 146 (second, third, and fourth alterations in original) (quoting Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977)); see also Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice, 746 F.3d 1082, 1088 (D.C. Cir. 2014) ("Agency affidavits sometimes take the form of a 'Vaughn' index.").

Here, after filing its Third Vaughn Index, and after the plaintiff challenged the sufficiency of that index, the defendant submitted the Garcia-Malene declaration, which "addresses in detail each document that [the] plaintiff challenges," Def.'s Reply at 13, and explains the basis for the defendant's withholding of information in the corresponding document pursuant to FOIA Exemption 5's deliberative process privilege, see Garcia-Malene Decl. ¶ 11. Consequently, as the defendant correctly notes, its Third Vaughn Index "must [not] be read in isolation." Def.'s Reply at 12.  The defendant's Third Vaughn Index broadly "steps through the claimed exemption[]," and although it discusses the individual documents, it does so by "describing the kinds of information withheld and how [the particular document] relate[s] to the exemption[]."  Judicial Watch, Inc., 449 F.3d at 147.  On the other hand, the Garcia-Malene declaration addresses the contents of each document, specifically explaining why the deliberative

process privilege applies to those contents.  See Garcia-Malene Decl. ¶ 11.  As the Circuit has

explained, this combination approach is sufficient because it provides the Court with "a

reasonable basis to evaluate the claim of [the deliberative process] privilege."  Gallant, 26 F.3d at

172–73; see also DiBacco, 795 F.3d at 186 n.2 ("Although agencies frequently rely on Vaughn

indices, [t]he materials provided by the agency may take any form so long as they give the

reviewing court a reasonable basis to evaluate the claim of privilege." (alteration in original)

(citation and internal quotation marks omitted)); Judicial Watch, Inc. 449 F.3d at 148 ("[The]

focus is on the functions served by the Vaughn index: to organize the withheld documents in a

way that facilitates litigant challenges and court review of the agency's withholdings.  The

[agency's] decision to tie each document to one or more claimed exemptions in its index and

then summarize the commonalities of the documents in a supporting affidavit is a legitimate way

of serving those functions." (internal citation omitted)).  Accordingly, the plaintiff's stand-alone

challenge to the sufficiency of the descriptions provided in the Third Vaughn Index is moot, as

the Court must assess the defendant's deliberative process privilege claim based on the entire

record, including the Garcia-Malene declaration.

### 2.  The Defendant's Invocation of FOIA Exemption 5

Notwithstanding the legitimate approach taken by the defendant, the plaintiff nonetheless

argues that the defendant's invocation of FOIA Exemption 5 as the basis for its withholdings is

improper.  See Pl.'s Mem. at 25–37; see also Pl.'s Reply at 12–30.  FOIA Exemption 5 protects

from disclosure "inter-agency or intra-agency memorand[a] or letters that would not be available

by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5)

(2012).  "Exemption 5 incorporates the privileges that the [g]overnment may claim when

litigating against a private party, including the governmental attorney-client and attorney work

product privileges, the presidential communications privilege, the state secrets privilege, and the deliberative process privilege." Abtew v. U.S. Dep't of Homeland Sec., 808 F.3d 895, 898 (D.C. Cir. 2015).

Here, the defendant invokes the deliberative process privilege, which "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8–9 (2001). "The privilege serves to preserve the 'open and frank discussion' necessary for effective agency decisionmaking[, and it] protects 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" Abtew, 808 F.3d at 898 (first quoting Klamath Water Users Protective Ass'n, 532 U.S. at 9; then quoting NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975)).

"To be exempt from disclosure under the deliberative process privilege, the agency must show that the information is both (1) 'predecisional' and (2) 'deliberative.'" Cleveland v. U.S. Dep't of State, 128 F. Supp. 3d 284, 298 (D.D.C. 2015) (Walton, J.) (quoting Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 39 (D.C. Cir. 2002)). "A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." Petroleum Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting Renegotiation Bd. v. Grumman Aircraft Eng'g Corp., 421 U.S. 168, 184 (1975)); see also Senate of P.R. v. U.S. Dep't of Justice, 823 F.2d 574, 585 (D.C. Cir. 1987) ("A document is 'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates."). "And a document is deliberative if it is 'a part of the agency give-and-take— of the deliberative process—by which the decision itself is made." Abtew, 808 F.3d at 899

(quoting Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C. Cir. 1975)); see also Pub. Emps. for Envtl. Responsibility v. EPA, 213 F. Supp. 3d 1, 11 (D.D.C. 2016) ("The 'key question' in determining whether the material is deliberative in nature 'is whether disclosure of the information would discourage candid discussion within the agency.'" (quoting Access Reports v. U.S. Dep't of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991))).

"The agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" Senate of P.R., 823 F.2d at 585–86 (quoting Coastal States Gas Corp. v. U.S. Dep't of Energy, 617 F.2d 854, 868 (D.C. Cir. 1980)). "The need to describe each withheld document when Exemption 5 is at issue is particularly acute because 'the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.'" Pub. Emps. for Envtl. Responsibility, 213 F. Supp. 3d at 11 (quoting Animal Legal Def. Fund, Inc. v. U.S. Dep't of Air Force, 44 F. Supp. 2d 295, 299 (D.D.C. 1999)). Accordingly, "to sustain its burden of showing that records were properly withheld under Exemption 5, an agency must provide in its declaration . . . precisely tailored explanations for each withheld record at issue." Nat'l Sec. Counselors v. CIA, 960 F. Supp. 2d 101, 188 (D.D.C. 2013). "[T]he agency must [also] describe 'the nature of the decisionmaking authority vested in the office or person issuing the disputed document(s), and the positions in the chain of command of the parties to the documents.'" Elec. Frontier Found. v. U.S. Dep't of Justice, 826 F. Supp. 2d 157, 168 (D.D.C. 2011) (Walton, J.) (quoting Arthur Andersen & Co. v. IRS, 679 F.2d 254, 258 (D.C. Cir. 1982)). "If the agency does not provide 'the minimal information necessary to make a determination concerning applicability of the deliberative process privilege[,]' then the court should deny the agency summary judgment." Hunton & Williams LLP v. EPA, 248 F. Supp. 3d 220, 241 (D.D.C. 2017) (quoting Elec. Frontier Found.,

826 F. Supp. 2d at 173).

In general, the plaintiff contends that

certain of the [Operational Review Team's] recommendations were adopted and implemented into [the SMD's] practice (if not formal "policy") and amounted to a change in the [SMD's] position concerning the chaplains, all documents reflecting those adopted or implemented recommendations, and the [Operational Review Team] or Marit Focus Group recommendations that preceded those actions, have lost any deliberative privilege they may have once held and must be released in full.

Pl.'s Reply at 22. The plaintiff also asserts that the defendant's explanations asserted in the Garcia-Malene declaration "do not justify any Exemption 5 withholdings." Id. at 23; see also id. at 23–30 (tying his general challenges to the specific documents containing withheld information). Because the plaintiff's general challenges coincide with his specific challenges to the documents containing withheld information, the Court will first evaluate the defendant's general claims and then apply that analysis to his specific disputes regarding each document.[14]

---

[14] The plaintiff argues that the defendant's explanations for its withholdings provided in the Garcia-Malene declaration, which was attached to the defendant's reply submission, "are untimely and should not be considered," Pl.'s Reply at 23, and as support for this proposition the plaintiff cites Citizens for Responsibility and Ethics in Washington v. United States Department of Justice, 854 F.3d 675 (D.C. Cir. 2017). In Citizens for Responsibility and Ethics in Washington, the Circuit reiterated that "the [g]overnment generally 'must assert all exemptions at the same time, in the original district court proceedings.'" 854 F.3d at 679 (quoting Maydak v. U.S. Dep't of Justice, 218 F.3d 760, 764 (D.C. Cir. 2000)). And because the government in Citizen for Responsibility and Ethics in Washington had not asserted FOIA Exemption 5 as a basis of its withholding until "on remand following an appeal," id. at 680, the Circuit concluded that "the [g]overnment's invocation of Exemption 5 was untimely and [that] the [g]overnment ha[d] not provided a sufficient basis for declining to apply the Maydak timeliness rule," id. at 681. Here, however, the defendant asserted its new explanations for its withholdings pursuant to FOIA Exemption 5 prior to the Court "reach[ing] the merits of the parties' initial summary judgment motions, and there have not yet been any appellate proceedings." Elec. Privacy Info. Ctr. v. Dep't of Justice, 296 F. Supp. 3d 109, 123 (D.D.C. 2017). Moreover, "as far as this Court can tell, [the plaintiff] has not been prejudiced in any meaningful sense by the delay." Id. Therefore, the factual circumstances presented in Citizen for Responsibility and Ethics in Washington are inapposite to the factual circumstances here, and therefore, the plaintiff's reliance on the Circuit's holding in that case is of no avail. Accordingly, the Court finds the defendant's new explanations raised in the Garcia-Malene declaration timely.

### a. The Plaintiff's General Challenges to the Defendant's Reliance on FOIA Exemption 5's Deliberative Process Privilege

#### 1. The SMD's Alleged Waiver of the Deliberative Process Privilege

The plaintiff contends that HHS "has publicly released many other [ ] review reports, which undercuts [the defendant's] argument that such documents are protected by the deliberative process privilege." Pl.'s Mem. at 31 (identifying three publically released review reports). Specifically, the plaintiff identifies "a review report about the NIH Clinical Center" that HHS released in April 2016 without "protect[ing] from disclosure th[at] review team's membership or final conclusions," and that allegedly "address[ed] many of the same issues that the 2007 Operational Review team discussed." Id. Additionally, the plaintiff states that in July 2017, HHS "released another Clinical Center report which contained the results of Focus Groups commissioned to implement the recommendations in the April 2016 Clinical Center report." Id. Thus, according to the plaintiff, the defendant "has not explained why" the Operational Review Team's final report and the Marit Focus Groups' findings "are confidential, pre-decisional, or deliberative, while similar follow-up reports have been readily released." Id. (internal quotation marks omitted).

The Court construes this argument as the plaintiff asserting that the defendant cannot avail itself to the protections of the deliberative process privilege to shield the Operational Review Team's and the Marit Focus Groups' final reports and their related documents from disclosure because that privilege has been waived by HHS's public release of purportedly similar reports. The Court disagrees for several reasons. First, the plaintiff "carries the burden of producing at least some evidence that the deliberative process privilege has been waived," Elec. Frontier Found. v. U.S. Dep't of Justice, 890 F. Supp. 2d 35, 46 (D.D.C. 2012) (Walton, J.), and

the plaintiff cannot satisfy that burden by conjecturing that the April 2016 Clinical Center report

"address[ed] many of the same issues" as the Operational Review Team's final report without

identifying specific information to support that position, see Pl.'s Mem. at 31; see also Elec.

Frontier Found., 890 F. Supp. 2d at 47 (holding that the plaintiff offered only "speculation" that

the "documents or information withheld as privileged . . . were voluntarily disclosed to

unnecessary third parties," (internal quotation marks omitted)).  Further, this "Circuit has

recognized that 'voluntary disclosure of privileged material . . . to unnecessary third parties . . .

waives the [deliberative process] privilege . . . for the document or information specifically

released,' although such disclosure does not waive the privilege 'for related materials.'"  Elec.

Frontier Found., 890 F. Supp. 2d at 46 (omissions in original) (quoting In re Sealed Case, 121

F.3d 729, 741 (D.C. Cir. 1997)).  Thus, to the extent that the deliberative process privilege had

once applied to the April 2016 Clinical Center Report and the July 2017 Focus Group findings, it

has waived that privilege, but only with respect to those documents and their underlying

information.  And, the plaintiff has not demonstrated that the underlying information disclosed in

those reports is the same information found in the 2007 Operational Review Team's or the Marit

Focus Groups' final reports.  Consequently, as the defendant correctly notes, the mere fact that

HHS elected not to protect the three identified reports from disclosure pursuant to the

deliberative process has no bearing on the defendant's assertion of the applicability of the

deliberative process privilege as to the documents in dispute in this case.  See Garcia-Malene

Decl. ¶ 11(3) (noting that the publicly released reports "demonstrate[] the agency's commitment

to asserting Exemption 5 only where appropriate" and explaining that those reports were publicly

released because they were either intended to be publicized or did not contain any policy

recommendations); see also Nat'l Sec. Archive v. CIA, 752 F.3d 460, 464 (D.C. Cir. 2014)

("[A]n agency does not forfeit the benefit of a FOIA exemption simply because of its prior decision to voluntarily release other similar information. Indeed, penalizing agencies in that way would discourage them from voluntarily releasing information, which would thwart the broader objective of transparent and open government." (internal citation omitted)). Accordingly, the Court finds the plaintiff's public disclosure waiver argument unconvincing.[15]

### 2. The SMD's Purported Adoption of the Operational Review Team's Final Report and Recommendations

The plaintiff also contends that "some of the [Operational Review Team's] recommendations were in fact adopted and implemented." Pl.'s Reply at 16; see also id. at 22 (arguing the same regarding the Marit Focus Group recommendations); Pl.'s Mem. at 30 ("The [o]perational [r]eview reports, opinions, and recommendations . . . all resulted in a final agency action."). In particular, the plaintiff argues that the record, including the defendant's "response to [his] statement of material facts establish[] that [the Operational Review Team's] recommendations were implemented by NIH." Pl.'s Reply at 20. Therefore, according to the plaintiff, the information that the defendant seeks to withhold has "los[t] [its] pre-decisional and deliberative privilege status," id. at 18, "and as a result[,] cannot be shielded under the deliberative process privilege," id. at 19. In response, the defendant represents that the Operational Review Team's report, opinions, or recommendations have not been adopted. See

---

[15] The plaintiff also argues that "[o]perational [r]eviews of the NIH Clinical Center are routine and mandated by the [Clinical] Center's Board of Governors' charter," Pl.'s Mem. at 30, and because operational reviews are "an integral aspect of the operations and policy positions of [HHS]," the 2007 "operational review is not considered a part of a deliberative process," id. at 31 (internal quotation marks omitted); see also id. at 30 (arguing that "[t]here is great public interest in knowing what a specially-chartered private-public advisory board for the '[g]overnment is up to.'" (quoting Shapiro v. U.S. Dep't of Justice, 969 F. Supp. 2d 18, 25 (D.D.C. 2013))). As the defendant notes, see Def.'s Reply at 15, the plaintiff does not cite any legal authority as support for this proposition. In any event, the Supreme Court has made clear that such routine reviews do not foreclose an agency's ability to invoke the deliberative process privilege to protect pre-decisions documents from disclosure. See Sears, Roebuck & Co., 421 U.S. at 151 n.18 ("Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decision; and the lower courts should be wary of interfering with this process.").

Def.'s Reply at 14.

"[U]nder [the] FOIA, agencies must disclose their 'working law,' i.e., the 'reasons which [supplied] the basis for an agency policy actually adopted.'" Elec. Frontier Found. v. U.S. Dep't of Justice, 739 F.3d 1, 7 (D.C. Cir. 2014) (third alteration in original) (quoting Sears, Roebuck & Co., 421 U.S. at 152–53); see also Judicial Watch, Inc. v. U.S. Dep't of Def., 847 F.3d 735, 739 (D.C. Cir. 2017) ("[While t]he deliberative process privilege reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as the strengths of policy options, coupled with the understanding that employees would be chilled from such rigorous deliberation if they feared it might become public[, t]he privilege [ ] avoids confusion from premature disclosure of ideas that are not—or not yet—final policy, and misimpressions from 'dissemination of documents suggesting reasons and rationales' not ultimately relied on." (internal citation omitted) (quoting Coastal States Gas Corp., 617 F.2d at 866)). Thus, "a document can lose its predecisional character—and the protections of the privilege—if an agency adopts the document as its own." Judicial Watch, Inc., 847 F.3d at 739; see also De Sousa v. CIA, 239 F. Supp. 3d 179, 201 (D.D.C. 2017) ("The law is well established that 'even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public.'" (quoting Coastal States Gas Corp., 617 F.2d at 866)).

For an agency to "adopt a deliberative document," and thereby lose the protections of the privilege, the agency must do more than "make vague or equivocal statements implying that a position presented in a deliberative document has merit; instead, the agency must make an 'express[ ]' choice to use a deliberative document as a source of agency guidance." Judicial Watch, Inc., 847 F.3d at 739 (emphasis and alteration in original) (quoting Sears, Roebuck &

Co., 421 U.S. at 161). However, where "[t]here is no evidence the withheld documents were expressly adopted," Sec. Fin. Life Ins. Co. v. U.S. Dep't of Treasury, No. 03-102 (SBC), 2005 WL 839543, at *7 (D.D.C. Apr. 12, 2005), courts must "determine whether a document constitutes the working law of an agency," id. at *8. "In making such a determination, a court should consider 'the function and significance of the document in the agency's decisionmaking process'; 'the nature of the decisionmaking authority vested in the office or person issuing the disputed document'; and whether the document was 'from [s]upervisors to [s]ubordinates, or [v]ice [v]ersa.'" Martin v. U.S. Equal Emp't Opportunity Comm'n, 19 F. Supp. 3d 291, 307 (D.D.C. 2014) (alterations in original) (quoting Taxation with Representation Fund v. IRS, 646 F.2d 666, 678–81 (D.C. Cir. 1981)). Moreover, the agency "does not carry the burden of proving that each withheld document was not adopted formally or informally." Sec. Fin. Life Ins. Co., 2005 WL 839543, at *7.

Here, the Court concludes that the evidence before it shows that the Operational Review Team's final report and the Marit Focus Groups' final report were neither formally or informally adopted by the defendant, and therefore the recommendations withheld by the defendant remain protected by the deliberative process privilege. The Garcia-Malene declaration emphatically states that HHS "has not implemented the Operational Review [Team's] Report[, and t]o the extent that [HHS] has taken any action on issues raised in the report, there is no evidence that such action was taken solely because of the [r]eport or for the reasons advanced in the [r]eport." Garcia-Malene Decl. ¶ 11(3).[16] Garcia-Malene further explains that

---

[16] The plaintiff postulates that the defendant's "own statements confirm that at least some of the [Operational Review Team's] opinions and recommendations were adopted by the Clinical Center," and therefore, "that information is releasable under [the] FOIA." Pl.'s Reply at 15. Specifically, the plaintiff contends that the defendant "cannot simultaneously claim no agency actions were taken as a result of the [o]perational [r]eview, and then state that some if 'not all' actions may have been taken, but not 'solely' because of the [report]." Id. (citing Def.'s Reply at 14). However, the plaintiff's reading of Garcia-Malene's statements is misplaced. Although the

(continued . . .)

> [t]he records withheld in full or in part under the deliberative process privilege consisted of e[-]mails to and from agency employees and consultants, [the SMD] Operational Review Action Plans which disclose the focus of specific policy and operational actions intended to improve the [SMD], the review of such plans, and notes and results of focus groups and other Operation Review Team thoughts and recommendations that would ultimately be presented to the [Advisory Board] and considered by NIH leadership for potential implementation.

Id. ¶ 8. Thus, given these representations, the Court cannot conclude that the defendant expressly adopted the Operational Review Team's final report as agency policy.

Furthermore, the factors regarding whether an agency informally adopted a document as agency policy counsel against concluding that the Operational Review Team's Report was in fact informally adopted by HHS. The Court so concludes primarily because the record contains no evidence that HHS uses the Operational Review Team's final report or the Marit Focus Groups' final report "as the agency['s] position on an issue or [ ] used by the agency in its dealings with the public." Coastal States Gas Corp., 617 F.2d at 866; see also Public Citizen, Inc. v. Office of Mgmt. & Budget, 598 F.3d 865, 875 (D.C. Cir. 2010) ("Documents reflecting [the agency's] formal or informal policy on how it carries out its responsibilities fit comfortably within the working law framework."). There is no evidence that the final reports or the recommendations contained therein are "routinely used by [the SMD's] staff as guidance . . . and were retained and referred to as precedent." United States v. Philip Morris USA Inc., 218 F.R.D. 312, 319 (D.D.C. 2003) (quoting Coastal States Gas Corp., 617 F.2d at 869). Moreover, the final reports were issued by individuals without decision-making authority, see Sec. Fin. Life Ins. Co., 2005 WL 839543, at *8 ("If the person or body issuing the document has final authority over the decision,

---

(. . . continued)

defendant's argument was not artfully worded, the defendant merely summarized the representations made by Garcia-Malene, that being, although the report and its underlying recommendations were considered, neither the report nor its recommendations were adopted as agency policy. Consequently, the Court does not find convincing the plaintiff's argument that the defendant's own statements confirm the agency's adoption of the Operational Review Team's report.

it is more likely that the document represents a final action of the agency, and must therefore be disclosed as agency working law."), and there is no evidence that the final reports were exchanged between superiors and their subordinates, see Elec. Frontier Found., 739 F.3d at 9 (noting that a document falls within the parameters of "working law" when it is used generally by "a higher authority [when] instructing a subordinate on how the agency's general policy applies to a particular case"). Thus, based on this record, the defendant did not informally adopt either of the final reports as agency policy.

Despite the record before the Court, the plaintiff relies on his "sworn testimony attesting to the implementation of the [Operational Review Team's] report." Pl.'s Reply at 16. In his declaration, the plaintiff notes that, as a staff chaplain in 2007, he participated in the operational review, particularly by taking part in the interviews conducted by the outside experts. See Heffernan Decl. ¶ 10 (discussing the topics addressed in the interviews and his communication with the Operational Review Team regarding other issues that needed to be addressed). The plaintiff further states that several e-mails sent after the conclusion of the operational review "led [him to] understand that the final report recommendations of the Operational Review Team were, in fact, being implemented by the [defendant]." Id. ¶ 11; see also Pl.'s Reply, Exhibit ("Ex.") 4 (E-mail correspondence from Gallin to staff chaplains) (Sept. 21, 2007) ("We have received our report of the operational review . . . and I have asked [Gormley] to oversee implementation of recommended changes beginning immediately."); id., Ex. 5 (E-mail correspondence from Gormley to the plaintiff) (Sept. 24, 2007) (indicating that that e-mail was a "follow up on plans for operational changes . . . that were recommended in the recent operational review and endorsed . . . by the [ ] Advisory Board," and that she wanted "to discuss with [the plaintiff] ideas . . . for how to implement the changes in a manner that respects [the plaintiff's] religious

accommodation"). Additionally, the plaintiff states that he attended several meetings concerning the "implement[ation of] the recommendations that had been suggested by the Operational Review Team," including the "assignments to specific nursing units for the inpatients hospitalized at the Clinical Center," Heffernan Decl. ¶¶ 12–13; see also id. ¶¶ 14–17 (discussing the concerns raised by the new assignments), and the "clarif[ication of] [ ] religious accommodation[s]," id. ¶ 17.[17]

After he was hired in early 2008, "the new chief chaplain announced that he was going to schedule focus group meetings to explore the changes in the chaplains' policies and operations needed for implementing the Operation Review [Team's] recommendations." Id. ¶ 19; see also id. (noting that it "was not stated explicitly" that the recommendations "called for th[e] focus group method . . . , but [ ] was explained as a method for implementing the . . . recommendations"). The Clinical Center then engaged an outside consulting firm to facilitate the focus group meetings, see id., which occurred in the fall of 2008 and were led by Diana Kunkel, who purportedly "used the Report of the Operational Review [T]eam's findings and recommendations as the framework for organizing the focus group meetings," id. ¶ 20. "Kunkel developed a report on the [f]ocus [g]roup sessions with recommendations on further implementation of the recommendations of the Operation Review Team['s] Report by the end of the year." Id. ¶ 21. The plaintiff notes that "Kunkel presented some of the general conclusions of the [f]ocus [g]roup discussions" at a "briefing" with the staff chaplains "in late January or February of 2009," id., but "[a]fter . . . one or two other staff chaplain meetings . . . , the chief chaplain discontinued having staff meetings," id. ¶ 22.

---

[17] As further support for his position that the SMD adopted the Operational Review Team's final report and the recommendations contained in that report, the plaintiff notes that the defendant does not dispute his statement of material facts regarding these preliminary steps taken by the SMD. See Pl.'s Reply at 20–21.

Contrary to the plaintiff's position, see Pl.'s Reply at 16, his sworn testimony regarding the initial actions taken by the SMD, the identified e-mails relating to the SMD's preliminary steps to potentially implement changes based on the recommendations in the Operational Review Team's report, and the defendant's assertions that it does not dispute certain of the plaintiff's statement of material facts corresponding to the plaintiff's testimony do nothing more than show that, at a particular time, the SMD considered making changes to its policies and practices that would be consistent with the recommendations presented in the Operational Review Team's final report and the Marit Focus Groups' final report, but never actually implemented those changes or adopted those recommendations as final agency policy.  Cf. De Sousa, 239 F. Supp. 3d at 202 ("Mere reliance on a document's conclusions does not necessarily involve reliance on a document's analysis; both will ordinarily be needed before a court may properly find adoption or incorporation by reference." (quoting Nat'l Council of La Raza v. U.S. Dep't of Justice, 411 F.3d 350, 358 (2d Cir. 2005))).  And, even though the SMD took initial steps regarding the potential implementation of changes based on those recommendations (i.e., distributing e-mails regarding the upcoming implementation of changes and convening meetings to discuss the allocation of possible new tasks), those steps do not appear to have borne any fruit.  Rather, the record suggests that those steps were nothing more than part of the SMD's deliberative process of determining whether changes to its policies and practices based on those recommendations were appropriate.

Moreover, there is no evidence that the SMD actually implemented actual changes to its policies or practices based on the Operational Review Team's final report or its recommendations.  In fact, the plaintiff acknowledges that the SMD did nothing more to implement the recommendations or make changes to its policies and practices after a handful of

meetings.  See Heffernan Decl. ¶ 22 (stating that after about three "staff chaplain meetings in the spring of 2009, the chief chaplain discontinued having staff meetings").  Consequently, the plaintiff's sworn testimony and his supporting evidence taken together contradict his position. See Pl.'s Reply at 16.  Instead, they bolster Garcia-Malene's representations that the Operational Review Team's final report was not adopted as agency policy.  See Garcia-Malene Decl. ¶ 11(3). Accordingly, the Court finds the plaintiff's adoption waiver argument unpersuasive.

In conclusion, the plaintiff's general challenges to the defendant's invocation of FOIA Exemption 5 and its deliberative process privilege do not permit the Court to conclude that the defendant's use of the privilege to shield the withheld information from disclosure was improper. Having made this determination, the Court now turns to the plaintiff's specific challenges to the information withheld and the defendant's descriptions of why that information is properly withheld pursuant to the deliberative process privilege.

### b. The Plaintiff's Challenge to the Defendant's Withholdings of the Pre-final Draft Press Release Regarding the SMD's Operational Review

The defendant withheld in full a "[p]re-final draft press release regarding [the 2007 operational] review of the [SMD] at [the] NIH."  Third Vaughn Index at 3 (addressing pages 163–64 of document labeled as A-2).  The defendant claims that it properly withheld this pre-final draft press release under FOIA Exemption 5 and its deliberative process privilege because "agency personnel used this [document as an] attempt to define and describe the contours of the anticipated operational review."  Garcia-Malene Decl. ¶ 11(1).  In response, the plaintiff asserts that FOIA Exemption 5 "cannot apply to [ ] draft press release[s that are] not related to any policy change," Pl.'s Reply at 24, and because the defendant claims that "there were no policy changes taken as a result of the [Operational Review Team's final report]," id. at

23–24, then the pre-final draft press release regarding the SMD's operational review in 2007 cannot be protected from disclosure pursuant to the deliberative process privilege, see id. at 24.

This "Circuit has made clear that simply designating a document as a 'draft' does not automatically make it privileged under the deliberative process privilege[,] . . . [and] factual information which does not bear on the policy formulation is not subject to the deliberative process privilege." Wilderness Soc. v. U.S. Dep't of Interior, 344 F. Supp. 2d 1, 14 (D.D.C. 2004) (Walton, J.) (internal citation omitted). Thus, the "[d]efendant[] must identify the function and significance . . . in the agency's decision making process of all redacted and withheld documents to qualify them as exempt under the deliberative process privilege." Mayer, Brown, Rowe & Maw LLP v. IRS, 537 F. Supp. 2d 128, 139 (D.D.C. 2008) (citation and internal quotation marks omitted). Moreover, given that the defendant has "identif[ied this] document as a draft, [it] must indicate whether the draft was '(1) adopted formally or informally, as the agency position on an issue,' or (2) 'used by the agency in its dealings with the public.'" Wilderness Soc., 344 F. Supp. 2d at 14 (quoting Judicial Watch, Inc. v. U.S. Postal Serv., 297 F. Supp. 2d 252, 261 (D.D.C. 2004)).

Here, the Court concludes that the defendant's explanations do not satisfy its burden of demonstrating that the deliberative process privilege applies to the withheld pre-final draft press release. Essentially, the defendant's descriptions of the withheld information in the pre-final draft press release are masked with discussions of draft press releases as a whole, see Garcia-Malene Decl. ¶ 11(1) (broadly explaining why the deliberative process privilege applies to draft press releases). With respect to the specifically withheld pre-final draft press release, the defendant only provides that it included "descriptions of prospective reviews" and that "[n]o final press release was ever located." Id. Such broad and vague descriptions do not assist the

Court in any meaningful manner in determining whether the privilege applies.  See Pub. Empls. for Envt'l. Responsibility, 213 F. Supp. 3d at 15 (holding that the agency's broad and vague descriptions were not sufficient either to assist the Court in determining whether the challenged documents were "both deliberative and pre[-]decisional" or "to carry the agency's burden to explain the function and significance of [the] document in the agency's decisionmaking process").  And, while "an agency may withhold a draft document if there is a danger of 'chilling' communication within the agency," Reliant Energy Power Generation, Inc. v. FERC, 520 F. Supp. 2d 194, 204 (D.D.C. 2007), the defendant's broad-sweeping descriptions do not demonstrate how the draft press release's "disclosure would 'expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions,'" Judicial Watch, Inc. v. U.S. Dep't of Treasury, 802 F. Supp. 2d 185, 198 (D.D.C. 2011) (quoting Quarles v. U.S. Dep't of the Navy, 893 F.2d 390, 392 (D.C. Cir. 1990)).

Moreover, although the pre-final draft press release was crafted before the operational review and therefore would be pre-decisional, the defendant's descriptions of this document are too obscure for the Court to determine its deliberative aspect.  See Hunton & Williams LLP, 248 F. Supp. 3d at 241 (providing that the agency's assertion of the applicability of the deliberative process privilege must have "reasonable specificity [as] a 'broad and opaque description . . . does not provide the Court with enough detail about whether [the withheld information is] deliberative and pre[-]decisonal'" (quoting Trea Senior Citizen League v. U.S. Dep't of State, 923 F. Supp. 2d 55, 68 (D.D.C. 2013))).  There is no indication as to what deliberative process the withheld pre-final draft press release concerned or its role in the formulation of policies or recommendations for policy change undertaken by the 2007 operational review.  See Ford Motor

Co. v. United States, 94 Fed. Cl. 211, 224 (2010) (holding that the deliberative process privilege protected "draft press releases and related correspondence [that were] pre-decisional . . . and reflect[ed] recommendations concerning policy"); see also Mayer, Brown, Rowe & Maw LLP, 537 F. Supp. 2d at 139 (ordering the draft press releases to "be produced in their entirety because they d[id] not 'bear on the policy formulation'" (citation omitted)).[18] And, even though the defendant has already indicated that the SMD has not formally or informally adopted the Operational Review Team's Final Report, the defendant has not asserted the same position with respect to the draft pre-final press release or indicated whether it was used by the SMD in its dealings with the public. See Wilderness Soc., 344 F. Supp. 2d at 14. Accordingly, because the defendant's descriptions of the withheld pre-final draft press release do not provide the minimum facts needed for the invocation of the deliberative process privilege, the Court must deny the defendant's motion for summary judgment on this claim. The Court will order the defendant to either produce to the plaintiff the withheld pre-final draft press release within thirty days of the issuance of this opinion or to submit an additional declaration that complies with the FOIA. See id.

### c. The Plaintiff's Challenge to the Defendant's Withholdings of the Operational Review Team's Pre-final Draft Reports

The defendant also withheld either in full or in part certain pages of the Operational Review Team's pre-final draft reports. According to the defendant, that withheld information "contains pre-decisional observations and recommendations." Third Vaughn Index at 5–6

---

[18] The Court also notes that the plaintiff's argument in response to the defendant's contention that there were no policy changes taken as a result of the Operational Review Team's final report, and therefore, the pre-final draft press release must be disclosed in its entirety, clearly misses the mark. See Pl.'s Reply at 23–24. The appropriate standard for drafts to be protected by the privilege is that the drafts must bear on policy formulation, not that they necessarily lead to policy change. See Mayer, Brown, Rowe & Maw LLP, 537 F. Supp. 2d at 139. In other words, the drafts must have some bearing on the deliberative, give and take process of formulating policy or recommendations for policy changes, in order to be covered by the privilege.

(discussing various pages of document labeled as A-12). The plaintiff in response contends that the defendant's explanations for its withholdings of the information in the pre-final draft reports do not justify the withholdings under the deliberative process privilege. See Pl.'s Reply at 24 (arguing that the defendant "has not indicated whether information in the draft [Operational Review Team] reports were (1) adopted formally or informally, as the agency position on an issue; or (2) used by the agency in its dealings with the public" (citation and internal quotation marks omitted)). The Court disagrees with the plaintiff.

The defendant's descriptions—albeit not overly comprehensive—do provide the Court with enough detail for it to determine that the deliberative process privilege protects from disclosure the withheld Operational Review Team's pre-final draft reports. In his declaration, Garcia-Malene represents that the operational review undertaken is "akin to a peer review" and is a "review process [that] includes an assessment of department procedures, performance[,] and leadership." Garcia-Malene Decl. ¶ 11(2). He further provides that "[t]he review team's assessments constitute opinions as to policies and procedures," and then suggests that the "draft reports [ ] include th[ese] assessment[s]." Id. Finally, Garcia-Malene adds that public disclosure of such draft reports "would jeopardize the integrity of the review process" and "the review team would be less likely to offer an open and honest assessment of the department and may even opt not to participate in the review process." Id. Thus, as indicated by Garcia-Malene's explanations, the Operational Review Team's pre-final draft reports are both pre-decisional and deliberative because they predate the preparation of the Operational Review Team's final report and they include recommendations and proposed changes to the SMD's existing policies. See Nat'l Sec. Archive, 752 F.3d at 463 (noting that the document "must have occurred before any final agency decision on the relevant matter" and that it must have been "intended to facilitate or

46

assist development of the agency's final position on the relevant issue[s]").  And the mere fact

that the Operational Review Team's final report did not ultimately result in final agency action

does not eliminate the protections the deliberative process privilege affords the drafts of the

Operational Review Team's final report.  See id. ("A privilege contingent on later events—such

as whether the draft ultimately evolved into a final agency position—would be an uncertain

privilege, and as the Supreme Court has said, an uncertain privilege is 'little better than no

privilege at all.'  In short, to require release of drafts that never result in final agency action

would discourage innovative and candid internal proposals by agency officials and thereby

contravene the purposes of the [deliberative process] privilege." (citation omitted)).[19]

Moreover, even though the defendant did not explicitly state that the pre-final draft

reports were neither formally or informally adopted as SMD policy, nor used in the SMD's

dealings with the public, the Court finds that the defendant's representations regarding the

Operational Review Team's final report are sufficient to indicate that the pre-final draft reports

were also not adopted or used by the SMD when dealing with the public.  See Garcia-Malene

Decl. ¶ 11(3) ("The agency has not implemented the Operational Review Report.  To the extent

that the agency has taken any action on issues raised in the report, there is no evidence that such

action was taken solely because of the [final r]eport or for the reasons advanced in the [r]eport.").

Accordingly, the Court must grant this aspect of the defendant's motion for summary judgment

---

[19] With respect to the drafts of the Operational Review Team's final report, the plaintiff reiterates his arguments that Garcia-Malene's representations are untimely and that the defendant has waived the deliberative process privilege by formally or informally adopting the Operational Review Team's final report either by policy or practice.  See Pl.'s Reply at 23–24.  In addition, the plaintiff raises these same arguments as a challenge to the defendant's withholdings of information in the Operational Review Team's final report.  See id. at 25.  And the plaintiff reasserts his adoption waiver argument for the defendant's withholdings of the Operational Review Team's opinions and recommendations contained in certain draft action plans and Power Point presentations, including those presented to the SMD's Advisory Board.  See id. at 26–27, 30.  The Court's prior conclusions regarding these arguments remain the same and are equally applicable to these challenges, see supra Part III.B.2.a, and therefore, the Court again rejects the plaintiff's waiver arguments as they relate to these specific challenges.

and deny the corresponding component of the plaintiff's cross-motion for summary judgment.

### d. The Plaintiff's Challenge to the Defendant's Withholdings of Certain E-mail Discussions

The plaintiff also disputes the defendant's withholdings of certain discussions contained in an e-mail chain between Gormley and Sara Byars that occurred in July and August 2007. See Pl.'s Reply at 25; see also Vaughn Index at 7 (providing that this e-mail chain concerned "whether to take specific action"). In particular, the plaintiff lodges two primary challenges: (1) this withheld information has lost its pre-decisional status "if any of the specific actions discussed in these e[-]mails were taken"; and (2) "the public has a right to know what the government is up to." Id. (citation and internal quotation marks omitted). The Court disagrees.

Initially, the Court notes that the plaintiff does not challenge the pre-decisional or deliberative nature of the withheld information in these e-mails, see id., and rightfully so, because there is no doubt that these discussions fall within the purview of the deliberative process privilege. They preceded any final agency action and played a role in the SMD's deliberative process of determining whether to make changes to "its services, policies, procedures and offerings." Garcia-Malene Decl. ¶ 11(4); see also id. (indicating that the subject line of the e-mail chain is "whether to take specific actions recommended by the Operational Review team"). Moreover, as Garcia-Malene notes, disclosure of this information "would prevent the [SMD] from operating effectively in the future" as "agency personnel or consultants/experts [would] fear the public disclosure of their opinions, advice, analyses, and recommendations such as those contained in these e[-]mails." Id. Thus, contrary to the plaintiff's position, see Pl.'s Reply at 25 ("[HHS's] concerns that federal employees fear disclosure of their opinions are overblown. That is the nature of being a public servant."), the defendant's concerns regarding the potential effects on deliberations by agency personnel on

further agency policy are not exaggerated, but consistent with the purpose of the deliberative process privilege, see United States v. Nixon, 418 U.S. 683, 705 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.").

In any event, the plaintiff's challenges regarding the withheld information in the e-mail discussions are unpersuasive. First, the plaintiff's waiver by adoption argument for this specifically withheld information is predicated on mere speculation that "working law" may exist. See Pl.'s Reply at 25 (stating that "if any of the specific actions discussed in these e[-]mails were taken by Gormley and others (as the September 2007 e[-]mails suggest they were), then these e[-]mail 'discussions' about such actions have lost their pre[-]decisional status and must be released" (emphasis added)). Such speculation that "working law" may exist in the e-mails cannot serve as a basis to conclude that the defendant has waived the deliberative process privilege and that its withholding of this information pursuant to that privilege were improper. See Vento v. IRS, 714 F. Supp. 2d 137, 154 (D.D.C. 2010) (holding that because the "[p]laintiffs rest[ed] their objection to the use of the [deliberative process] privilege to withhold documents on mere speculation that some of the documents might include working law," the Court could not determine that the invocation of the privilege was improper). And, the plaintiff's reliance on a September 2007 e-mail between Gormley and the plaintiff as the only support for his speculative position is misplaced, primarily because that e-mail clearly indicates that the actions Gormley took were discussions about ideas on how to implement changes recommend by the operational review, not actual actions that led to the adoption of agency policy. See Pl.'s Reply, Ex. 5 (E-mail correspondence from Gormley to the plaintiff) (Sept. 24, 2007) (Gormley "writing

to follow up on plans for operational changes . . . that were recommended in the recent operational review and endorsed . . . by the [ ] Advisory Board," stating that she "would like to discuss with [the plaintiff] ideas [she] ha[d] for how to implement the changes in a manner that respects [the plaintiff's] religious accommodation"). Consequently, this e-mail demonstrates that Gormley did nothing more than engage in the give-and-take deliberative process undertaken by the SMD to determine whether changes to its policies and practices were appropriate. Thus, the Court finds this argument unconvincing.

Without question, the plaintiff is correct in that "the public's right to know how its government is conducting its business has long been an enduring and cherished value." Judicial Watch, Inc. v. U.S. Dep't of Justice, 365 F.3d 1108, 1122 (D.C. Cir. 2004); see also Pl.'s Reply at 25. However, the "FOIA represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential." Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 925 (D.C. Cir. 2003); see also McKinley v. Bd. of Governors of the Fed. Reserve Sys., 849 F. Supp. 2d 47, 55–56 (D.D.C. 2012) ("Congress recognized 'that legitimate governmental and private interests could be harmed by release of certain types of information and provided nine specific exemptions under which disclosure could be refused." (quoting FBI v. Abramson, 456 U.S. 615, 621 (1982))). And, in the context of FOIA Exemption 5 and its deliberative process privilege, the public's right to know is generally confined to the reasons and analysis underlying "policy actually adopted." Sears, Roebuck & Co., 421 U.S. at 152 ("The public is only marginally concerned with reasons supporting a policy which an agency has rejected, or with reasons which might have supplied, but did not supply, the basis for a policy which was actually adopted on a different ground. In contrast, the public is vitally concerned with the reasons which did supply the basis for an

agency policy actually adopted.").  Thus, because the record does not indicate that the SMD

actually adopted either formally or informally the Operational Review Team's recommendations

as policy, the Court finds the plaintiff's public interest argument also unpersuasive.

Accordingly, the Court must grant this aspect of the defendant's motion for summary judgment

and deny the related aspect of the plaintiff's cross-motion for summary judgment.

> ### e. The Plaintiff's Challenge to the Defendant's Withholdings of Records Related to the Marit Focus Group, Its Recommendations, and Final Report

Lastly, the plaintiff challenges the defendant's withholdings of information related to the

plans for conducting the Marit Focus Group and the Marit Focus Group's notes, survey results,

and final report containing the group's opinions, recommendations, and findings, see Pl.'s Reply

at 27–30, which served "to assist NIH leadership reorganize the [SMD] and/or alter [the] scope

of services provided," Third Vaughn Index at 13 (discussing the defendant's withholdings

regarding document labeled as C-5).  The plaintiff contends that this withheld information is "not

pre-decisional in nature, as the[] [withheld information] came after the implementation of the

[Operational Review Team's] report and recommendations," and therefore the defendant

improperly withheld this information pursuant to the deliberative process privilege.  Pl.'s Reply

at 28.  The Court disagrees.

Contrary to the plaintiff's position, the Court finds that the defendant has carried its

burden of demonstrating that this specifically withheld information was in fact pre-decisional

and part of the SMD's deliberative process.  As Garcia-Malene explains, this withheld

information involves "the pre[-]decisional opinions, recommendations[,] and suggestions of the"

Marit focus groups that were part of "the deliberative process of the [SMD] as it worked to make

decisions about its services, policies, procedures[,] and offerings."  Garcia-Malene Decl.

¶ 11(12).  Garcia-Malene further states that "[a]ll participants in the focus groups were agency employees," and disclosure of this information "would damage the decision-making process by stifling and chilling such exchanges of information prior to the adoption of a final position by the agency, or by the government."  Id.; see also id. ("Concern by an agency employee or consultant/expert that his or her views and analyses would be publicly disseminated would result in a more cautious, less effective performance of his or her duties.").  Consequently, although the plaintiff is correct that the Marit Focus Group, as well as this specifically withheld information, occurred after the Operational Review Team's Final Report and recommendations, see, e.g., Pl.'s Reply at 28, the record does not indicate that the SMD's deliberative process ended with the Operational Review Team's Final Report and recommendations, as the SMD utilized the focus groups to seek ways to improve its services and policies, see Garcia-Malene Decl. ¶ 11(12).  Accordingly, given the defendant's representations regarding the deliberative process involved pertaining to the challenged records, the role the information withheld played in that process, and the role and the decision-making authority of the individuals involved in the creation of this withheld information, see Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 243 F. Supp. 3d 155, 169 (D.D.C. 2017) (setting forth the minimum information the agency's declarations must contain), the Court is satisfied that the defendant properly withheld this information pursuant to FOIA Exemption 5's deliberative process privilege, see id. at 169 ("[T]o the extent information in the documents includes 'recommendations' or 'opinions on legal or policy matters,' they are clearly 'deliberative' in nature and non-disclosure is permissible under Exemption 5." (quoting Vaughn, 523 F.2d at 1143–44)).[20]

The plaintiff relies on Hardy as support for his position that the defendant may not invoke

---

[20] To the extent that the plaintiff seeks to assert his waiver by adoption argument regarding this specifically withheld information, the Court likewise rejects that argument as it did for the plaintiff's other identical challenges.

the deliberative process privilege to "withhold the Marit Focus Group survey results or underlying data (questions, answers, documents presented to focus groups)" or "[t]he final Marit Focus Group report, which contains the survey results of those focus groups, as well as the underlying focus group data and responses." Pl.'s Mem. at 33–34; see also Pl.'s Reply at 28–29 ("[I]n Hardy, the [c]ourt explained that survey results, survey data, and analyses of such data are quintessentially factual information that reveal[] little about an agency's deliberative process. . . . Hardy reiterates the [ ] Circuit's long-standing conclusion that survey results are not the kind of factual information protected from disclosure under Exemption 5." (citation and internal quotation marks omitted)).  However, the plaintiff's reliance on Hardy is to no avail, primarily because the factual circumstances in that case are distinguishable from those here.  In Hardy, the court determined that the agency did not provide sufficient justifications to withhold survey-related documents pursuant to the deliberative process privilege for various reasons.  See 243 F. Supp. 3d at 172–73.  First, the agency had already produced "the survey questions in their entirety, and the results and data in part," and did not adequately "explain how the withheld information [was] 'different from those released in any relevant respect.'"  Id. at 172 (quoting Army Times Publ'g Co. v. U.S. Dep't of Air Force, 998 F.2d 1067, 1068 (D.C. Cir. 1993)).  In addition, the survey results and final survey data were "anonymized collections of information," and therefore, it was unlikely that disclosure would "stifle honest and frank communication within the agency."  Id. at 173 (quoting Wilderness Soc'y, 344 F. Supp. 2d at 15).  More importantly, the agency "had no control over the content of the survey responses, and thus [could ]not say [that] the 'materials . . . b[ore] on the formulation or exercise of agency policy-oriented judgment.'"  Id. (omission in original) (quoting Petroleum Info. Corp., 976 F.2d at 1435); see also id. ("FOIA does not permit 'scientific studies [to be] cloaked in secrecy by an

exemption designed to protect only those internal working papers in which opinions are expressed and policies formulated or recommend.'" (alteration in original) (quoting Bristol-Myers Co. v. Fed. Trade Comm'n, 424 F.2d 935, 939 (D.C. Cir. 1970))).

Here, Garcia-Malene represents in his declaration that "NIH has not released a portion of the surveys without explaining why it seeks to withhold the rest." Garcia-Malene Decl. ¶ 11(10). Furthermore, according to Garcia-Malene, "the Focus Group survey results were far from factual questions. Instead, the NIH Focus Group survey results consist[ed] of recommendations and suggestions." Id. And, he states that "disclosure of the recommendations and suggestions . . . found in the Focus Groups answers to survey questions withheld under the deliberative process privilege would result in an intrusion into the deliberative process of the agency as it worked to make decisions about its services, policies, procedures and offerings." Id. As the defendant correctly notes, such an intrusion would certainly have a chilling effect on the SMD personnel freely exchanging advice, opinions, and recommendations on policy and departmental changes. See id. (asserting that such a disclosure would deter "future free exchanges of information" within the SMD and between SMD personnel and consultants). Thus, unlike the agency in Hardy, based on these representations and the representations previously discussed, the defendant has provided the Court with sufficient justification for its withholdings of this information pursuant to the deliberative process privilege. Accordingly, the Court must grant this aspect of the defendant's motion for summary judgment and deny the corresponding aspect of the plaintiff's cross-motion for summary judgment.

## C. Segregability

The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt

under this subsection." 5 U.S.C. § 552(b). "[I]t has long been the rule in this Circuit that non-exempt portions of a document must be disclosed <u>unless</u> they are inextricably intertwined with exempt portions." <u>Wilderness Soc'y</u>, 344 F. Supp. 2d at 18 (quoting <u>Mead Data Cent., Inc.</u>, 566 F.2d at 260). "The focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." <u>Mead Data Cent. Inc.</u>, 566 F.2d at 260.

A district court's determination that agency records are exempt from disclosure under the FOIA is subject to remand if the court does not also make specific findings on the question of segregability. <u>See</u> <u>Krikorian v. U.S. Dep't of State</u>, 984 F.2d 461, 467 (D.C. Cir. 1993). To make this determination, the agency must provide a "relatively detailed description" of the withheld material. <u>Id.</u> (citing <u>Goldberg v. U.S. Dep't of State</u>, 818 F.2d 71, 78 (D.C. Cir. 1987)). Agencies must review the withheld documents and determine whether, absent the exempted material, the resulting document would still be comprehensible, or whether "the result would be an essentially meaningless set of words and phrases." <u>Mead Data Cent., Inc.</u>, 566 F.2d at 261 (stating that the result being a meaningless set of words may be sufficient to claim that the information is not segregable). A "page-by-page" review of all the documents and a declaration that each piece of information that is withheld is not reasonably segregable is sufficient to show that an entire document cannot be produced. <u>Juarez v. U.S. Dep't of Justice</u>, 518 F.3d 54, 61 (D.C. Cir. 2008); <u>Beltranena v. U.S. Dep't of State</u>, 821 F. Supp. 2d 167, 178–79 (D.D.C. 2011).

Here, the Court is not satisfied that the defendant has conducted a proper segregability analysis regarding the information that it has withheld. The defendant has submitted to the Court approximately six declarations, and only one of them addresses the defendant's segregability assessment of one particular document, <u>see generally</u> Garcia-Malene Supp. Decl. In that

declaration, Garcia-Malene addresses only the twenty-one-page Power Point presentation that was produced to the plaintiff on December 11, 2017, see id. ¶ 5, and states that he "reviewed th[at] document carefully . . . to ensure that all reasonably segregable information was released to [the] plaintiff," id. ¶ 7. Based on that review, he concluded that "all reasonably segregable information [in that presentation] was released to [the] plaintiff." Id. Other than this representation, only two of the declarations discuss the defendant's segregability assessment of the other documents withheld either in full or in part, and do so in broad, conclusory terms without any meaningful explanations. See Cornell Decl. ¶ 23 ("For all records at issue in this case, all reasonably segregable, non-exempt information has been released. For records withheld in their entirety, there was no reasonably segregable material or [the] non-exempt information amounted to essentially meaningless words and phrases."); see also Uhl Decl. ¶ 4(2) ("All reasonably segregable factual information has been released. To the extent that any factual information was withheld, it is inextricably intertwined with the deliberative information."). Without more, the Court finds that these representations are not sufficient to discharge the defendant's segregability obligations because they do not provide the Court with the minimum information needed, particularly, whether "the [defendant] conducted a line-by-line review of the [withheld information] to ensure that it contained no segregable, nonexempt information." Anguimate v. U.S. Dep't of Homeland Sec., 918 F. Supp. 2d 13, 22 (D.D.C. 2013) (Walton, J.); see also id. (providing that "an agency's affidavit that . . . states that an agency official 'personally conducted a line-by-line review of each document withheld in full and determined that no documents contained releasable information which could be reasonably segregated from the nonreleasable portion' is 'sufficient to fulfill the agency's obligation to show with reasonable specificity why a document [could not] be further segregated.'" (second alteration in original)

(quoting <u>Johnson v. Exec. Office for U.S. Attorneys</u>, 310 F.3d 771, 776 (D.C. Cir. 2002))).

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part and deny in part without prejudice the defendant's motion for summary judgment and deny the plaintiff's cross-motion for summary judgment.  Specifically, with respect to the adequacy of the defendant's searches, the defendant's motion for summary judgment is granted in regards to the defendant's searches for the SMD's Clinical Center Policies from 2008 through 2010 and for records related to the 2007 operational review as limited to the tentative staff nursing assignments and denied without prejudice in regards to the defendant's searches for the fall 2007 Chief Operating Officer Power Point presentation and John Pollock's Response to a July 27, 2009 e-mail.  Furthermore, in regards to the defendant's withholdings, the defendant has submitted declarations reasonably detailed to justify each of its withholdings pursuant to the deliberative process privilege, except for the withheld pre-final draft press release.  However, because the defendant has not provided the Court with the proper segregability analysis for it to determine that all reasonably segregable information has been released, the defendant's motion for summary judgment on these aspects of its motion is denied without prejudice.

**SO ORDERED** this 27th day of June, 2018.[21]

REGGIE B. WALTON
United States District Judge

---

[21] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.